**Lennox, Sheriff, v. Clark, Jr., Mayor, et al.**

290

Before Milner and Mawhinney, JJ., en banc.

*Grover C. Ladner, Francis X. McClanaghan* and *Joseph E. Gold,* for plaintiff.

*Abraham L. Freedman,* city solicitor, and *Robert M. Landis,* assistant city solicitor, for defendants.

*Eric A. McCouch* and *William Barclay Lex,* for amicus curiæ.

MILNER, J., November 6, 1952.—The pleadings in this case present solely legal questions for our consideration. The matter was argued on October 24, 1952, and it was agreed by the parties that the court consider the matter as on plaintiff's motion for judgment on the pleadings and enter its final decree.

Plaintiff contends that defendants, officers of the City of Philadelphia, are unlawfully endeavoring and threatening to enforce as against him and his employes the provisions of the Philadelphia Home Rule Charter relating to civil service and personnel provisions and

also the allied provisions prohibiting certain political activity by appointed officers and employes of the city; and that defendant director of finance proposes to delete plaintiff's request for funds to pay salaries for solicitors from the city budget on the theory that such services are to be provided only by the city solicitor's office. It is plaintiff's principal contention that the functions of his office are not subject to the provisions of the Home Rule Charter in any respect.

Defendants in their answer, do not controvert the pertinent factual allegations of the complaint, but they challenge plaintiff's statements of law. Defendants deny plaintiff's contention "that the charter was intended to apply solely to municipal functions and not to county functions" and aver "that the charter includes the functions of county offices which became city offices by operation of the City-County Consolidation Amendment." Defendants contend that "plaintiff's office is now a city office and is subject to all of the provisions of the Home Rule Charter, without any further action by either the [city] council or the [State] legislature to make such provisions effective as to him and his office."

Substantially the same questions raised here have been presented in other cases before this court involving the recorder of deeds, register of wills, clerk of the court of oyer and terminer and quarter sessions of the peace, the county commissioners and the coroner, all being designated in the Constitution as county officers (article XIV, sec. 1). We shall consider the scheme of all county offices in expressing our views. As we stated in the case of Meade et al. v. Clark et al., 87 D. & C. 314, involving the board of revision of taxes and the registration commission, in which we are this day filing a companion opinion, we are passing only on the applicability of the specific charter sections involved in this

case. In the city's brief on the six "county cases" it is stated:

"The issues between the parties are basically these: whether the personnel and civil service provisions apply to the former county offices; whether the former county offices are prohibited by the provisions of the charter from appointing private solicitors to serve them in their official capacity, and whether the prohibitions against political activities by employes of the city extend to employes of the former county offices."

Prior to 1922 the legislature was without power under the State Constitution to permit cities in Pennsylvania to govern themselves by home rule charters. By the adoption of the amendment to article XV, sec. 1, of the Constitution, in 1922, this barrier was removed and the General Assembly was empowered to pass legislation authorizing the adoption of municipal home rule charters. The amendment of 1922 had, at last, paved the road leading to home rule in Philadelphia. Article XV, sec. 1, provides as follows:

"Cities may be chartered whenever a majority of the electors of any town or borough having a population of at least ten thousand shall vote at any general or municipal election in favor of the same. *Cities, or cities of any particular class, may be given the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature.* Laws also may be enacted affecting the organization and government of cities and boroughs, which shall become effective in any city or borough only when submitted to the electors thereof, and approved by a majority of those voting thereon." (Italics supplied.)

Twenty-seven years of persistent and patient effort by civic groups and citizens of Philadelphia, keenly

concerned with the city's welfare, were, however, required to obtain from the legislature the First Class City Home Rule Act (hereinafter sometimes referred to as Home Rule Act) of April 21, 1949, P. L. 665, 53 PS §3421.1 et seq., which provided the machinery for the adoption of a Philadelphia Home Rule Charter (hereinafter sometimes referred to as charter).

On the day of the passage of the Home Rule Act, the General Assembly also approved, for the first time, a resolution proposing the so-called Philadelphia City-County Consolidation Amendment, adding section 8 to article XIV of the Constitution — another step toward the achievement of the final goal of eventually establishing the framework for efficient and streamlined government in Philadelphia with the consolidation of the theretofore separate city and county governmental units within its boundaries.

On April 17, 1951, the Philadelphia Home Rule Charter was adopted. By its terms it was to become operative on January 7, 1952, as to all provisions material in the cases before us. That was the day on which, following their election on November 6, 1951, the mayor and members of the new council (to serve under the new charter) and certain of the county officers, were to assume their offices. The consolidation amendment, however, then still required legislative approval for the second time and approval by the electors of the entire State before it could become part of the Constitution. The legislative approval and the adoption of the amendment were forthcoming and, on November 6, 1951, the amendment was adopted by an overwhelming vote. The key question which is now posed is whether this combination of legislative action, constitutional change and charter adoption effected the result of subjecting county offices to *all* of the provisions of the Home Rule Charter, as contended. We do not think so.

On November 6, 1951, the voters of the Commonwealth adopted as an amendment to the Constitution article XIV, sec. 8, familiarly referred to as the City-County Consolidation Amendment. This section provides in full as follows:

"(1) In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law.

"(2) Local and special laws, regulating the affairs of the City of Philadelphia and creating offices or prescribing the powers and duties of officers of the City of Philadelphia, shall be valid notwithstanding the provisions of section 7 of Article III of this Constitution.

"(3) All laws applicable to the County of Philadelphia shall apply to the City of Philadelphia.

"(4) The City of Philadelphia shall have, assume and take over all powers, property, obligations and indebtedness of the County of Philadelphia.

"(5) The provisions of Article XV, Section 1 of the Constitution shall apply with full force and effect to the functions of the county government hereafter to be performed by the city government.

"(6) The amendment shall become effective immediately upon its adoption.

"(7) Upon adoption of this amendment all county officers shall become officers of the City of Philadelphia, and, until the General Assembly shall otherwise provide, shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, but such officers serving when this amendment be-

comes effective shall be permitted to complete their terms."

Article XV, sec. 1, referred to in paragraph 5, is the constitutional amendment of November 7, 1922, quoted above, providing, inter alia, that "cities of any particular class, *may be given* the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations and regulations, as may be imposed by the legislature." (Italics supplied.)

We think that it was clearly intended by paragraph 5 to *authorize* "county" home rule; we are also of the opinion, for the reasons hereinafter indicated, that such county home rule did not *automatically* result from the adoption of the section 8 amendment. The words "may be given" have reference to action by the State Legislature and, unless it can be successfully contended that the *First Class City* Home Rule Act (of April 21, 1949, P. L. 665, 53 PS §3421.1 et seq.) is also the enabling legislation for a Philadelphia *County* Home Rule Act, we must determine to what extent, if any, the legislature intended to and did retain legislative control and authority over county affairs which were thereafter to be designated and considered city functions, in the event of the future adoption of the City-County Consolidation Amendment. The First Class City Home Rule Act (Senate Bill No. 5) and the City-County Consolidation Amendment (Senate Resolution No. 654) were considered together in the legislature. Both items were approved through third reading and final passage by the Senate on April 4, 1949; both were likewise approved in the House on April 11, 1949. It is needlessly confusing to list the chronology of this legislation, so that it would appear that the consolidation amendment was passed by

the legislature on April 11, 1949, and the First Class City Home Rule Act was approved on April 21, 1949. The latter date is the date on which the Governor approved the measure but it was actually considered and approved by the legislature on April 11, 1949, as we have indicated. We are of course bound by the legislative intent.[1] Aside from the indicated simultaneous consideration of the consolidation amendment and the Home Rule Act, these items, as well as the Home Rule Amendment of 1922 (article XV, sec. 1) and the charter, relate to the same subject matter, i.e., the governance of the City of Philadelphia, are *in pari materia* and must be construed together. See section 62 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §562.

Despite such simultaneous consideration of the subjects of home rule and city-county consolidation we are unable to find a single clue in the First Class City Home Rule Act indicating a legislative intent that the city could frame a charter on an assumption that it would extend to former county functions if, as, and when the consolidation amendment were adopted. Such an intention could have been easily indicated in the several appropriate sections of the Home Rule Act. Section 11 of the Home Rule Act (53 PS §3421.11) provides, inter alia, as follows:

"Any new charter or amendments to the charter of a city thus proposed, which are approved by a majority of the qualified electors voting thereon, shall become the organic law of the city at such time as may be

---

[1] The rule on constitutional construction is that where language is untechnical it is to be construed as the people who voted for the constitutional amendment probably understood it: O'Connor v. Armstrong et al., 299 Pa. 390 (1930), and the cases there cited. Here, however, the language and concepts are technical and legal in nature and there is involved the Home Rule Act passed by the legislature. In such circumstances the intent of the legislature submitting the proposal is an important consideration.

fixed therein and all courts shall take judicial notice thereof. So far as the same are consistent with the grant of powers and the limitations, restrictions and regulations hereinafter prescribed, they shall supersede any existing charter and all acts or parts of acts, local, special, or general, affecting the organization, government and powers of such city, to the extent that they are inconsistent or in conflict therewith. . . . All government and powers of the city, not inconsistent or in conflict with the organic law so adopted, shall remain in full force . . .".

Section 17 of the Home Rule Act (53 PS §3421.17) provides as follows:

"Subject to the limitations hereinafter prescribed, the city taking advantage of this act and framing and adopting or amending its charter thereunder shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions, including the power and authority to prescribe the elective city officers, who shall be nominated and elected only in the manner provided by, and in accordance with, the provisions of the Pennsylvania Election Code and its amendments, for the nomination and election of municipal officers. The charter of any city adopted or amended in accordance with this act may provide for a form or system of municipal government and for the exercise of any and all powers relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, and with like effect, and the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law. Ordinances, rules

and regulations adopted under the authority of this act or under the provisions of any charter adopted or amended hereunder shall be enforceable by the imposition of fines, forfeitures and penalties, not exceeding three hundred dollars ($300), and by imprisonment for a period not exceeding ninety days."

We do not understand how it can be satisfactorily contended that this combination of legislative action and constitutional change effected, without more, ʻthe result of *county* home rule. The cardinal rule of construction, in this circumstance, while one of liberality, to effectuate the design of local self-government, must be one of stringency in determining those areas of governmental power which are more or less *permanently* surrendered by the State to the municipality.[2]

In section 17 of the Home Rule Act, quoted in full above, the legislature granted authority to "provide for a form or system of municipal government and for the exercise of any and all powers relating to its municipal functions . . . to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class . . .".

There is no indication whatsoever that power is granted to the full extent that the General Assembly may legislate in reference thereto as to *counties* of the first class. Defendants argue that with the abolition

_____

[2] We do not intend in any sense to pass upon the question of power of the State legislature to reclaim home rule powers once granted. See Philadelphia Home Rule Charter, annotated, sec. 1-100, where the annotators state: "The General Assembly, having granted to the City powers of home rule pursuant to the Constitution, is now foreclosed from legislating on matters coming within the scope of the powers granted. Legislation in the home rule area is now within the exclusive province of the City Council. Nor may any of the powers granted be withdrawn by the General Assembly; they may, of course, be enlarged by the General Assembly."

In view of the charter commission's conclusion in this annotation there is more clearly seen the broad unanticipated scope and consequences of defendants' present contentions.

of any county distinction as to Philadelphia the county functions became municipal functions and therefore are encompassed in the original grant of power under the Home Rule Act. The exercise of the county functions by a city is unprecedented in the history of the Commonwealth and in the absence of clear legislative intent the traditional term "municipal functions" cannot be so expanded by a constitutional change subsequent to the usage of such term by the legislature. Granting the fact that the consolidation amendment abolished all county offices in Philadelphia as of November 6, 1951, and provided for the performance of all county functions by the *city* (not *city officers*) it did not thereby subject such functions to the city charter. There is nothing difficult with the result that city officers (theretofore county officers) should continue to perform duties and exercise powers relating to functions of county government more or less elaborately outlined by the legislature. The transition was quite complete. Section 8(3) of the consolidation amendment provided: "All laws applicable to the county of Philadelphia shall apply to the City of Philadelphia" and such functions were to be performed by officers "selected in such manner as may be provided by law". The phrase "as may be provided by law" necessarily must have meant "as *then* provided by law" and also "as might in the future be provided by law". On November 6, 1951, by the unambiguous language of the amendment, county officers became city officers prior to the effective date of the charter, January 7, 1952, and they continued to perform their duties and exercise powers under applicable "county" laws which were *co-effective* with the laws relating to municipal functions. Defendants in their brief have quite adequately pointed out instances in which the Commonwealth may impose duties on and grant powers to city officers. See Commonwealth v. Collier, 213 Pa. 138 (1905). The signifi-

cance of the consolidation amendment is in making possible the consideration of integration of city and former county functions; but such integration must be implemented and controlled, if so desired, by the legislature.

The fact that the consolidation amendment abolished all county offices and provided that the city perform all county functions did not in any way affect the character of the functions to be performed. The nature of a governmental function, whether State, county or city, is not determined by the position of him who performs it or his designation as a city, county or State officer. The nature of the function must be ascertained by regard to the scheme of government.

It could also be contended that section 17 provides that the city "may exercise all powers and authority of local self-government" and that "local self-government" is of broader scope than "municipal government" or "municipal functions". We do not think so. Without engaging in detailed consideration of county offices and functions it is sufficient to note that there is a real not spurious distinction between such county functions and local or municipal functions. In general, municipal functions have more limited impact to the area and persons of the municipality; county functions, in general, reflect matters of broader policy and concern to the area and people of the entire Commonwealth.

Though there may be found various instances where counties are loosely referred to as municipal corporations the distinction between counties and municipalities has always been maintained in this Commonwealth. In Garr et al. v. Fuls et al., 286 Pa. 137 (1926), Mr. Justice Sadler stated:

"The county is a quasi-municipal corporation, which aids in the enforcement of the policy of the state: Chester Co. v. Brower, 117 Pa. 647. Merely because to it have been delegated certain local rights of govern-

ment 'does not sever it as a body from the state': Com. v. Brice, 22 Pa. 211. As distinguished from a municipal corporation, 'a county organization is created almost exclusively with a view to the policy of the State at large. . . . With scarcely an exception, all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the State, and are in fact but a branch of the general administration of that policy': Freeze v. Columbia Co., 6 W. N. C. 145, 146 . . .".[3]

Assuming that the legislature *could* grant to the City of Philadelphia home rule on the subject of county functions before it constitutionally even had the power to do so, in anticipation of such power, it should most clearly appear that the legislature so intended before such delegation of power be presumed. The powers of a municipality [4] by the familiar rule, sometimes characterized as Dillon's rule, are to be strictly construed: Valley Deposit and Trust Company of Belle Vernon, 311 Pa. 495 (1933); Wentz v. Philadelphia et al., 301 Pa. 261 (1930); American Aniline Products, Inc., v. Lock Haven, 288 Pa. 420, 423 (1927); Lesley v. Kite, 192 Pa. 268, 274 (1899); Appeal of Whelen, 108 Pa.

---

[3] On the subject of counties as political subdivisions of the State as distinguished from municipal corporations see Hartness v. Allegheny County, 349 Pa. 248, 250-51 (1944); Kraeling et vir v. Dormont Borough, 352 Pa. 644 (1945); Kittanning Academy v. Brown, 41 Pa. 269 (1861). In Tioga Co., Pa., v. Bohnert, 29 F. 103 (1924) it was stated that a county in Pennsylvania is generally recognized as a "quasi-corporation" on which duties wholly involuntary are imposed, which possesses no powers and can incur no obligations not authorized by statute. See also Breinig et ux. v. Allegheny County et al., 332 Pa. 474, and compare County of Chester v. Brower, 117 Pa. 647 (1888); Lamoreux v. The County of Luzerne, 116 Pa. 195 (1887), both dealing with the concept of "county" as being within the scope of article XVI, sec. 8 of the Constitution (eminent domain).

[4] There is no contention that Philadelphia is no longer a municipality insofar as the scheme of government within the Commonwealth is concerned.

162, 197 (1884) ; Pittsburgh Railways Co. et al., v. P. S. C. et al., 115 Pa. Superior Ct. 58, 65, 66 (1934); Dillon, Municipal Corporations (fifth ed., 1911), sec. 237. In section 1-100 of the charter defining the city's powers, the city pursuant to section 1 of article XV of the Constitution and the Home Rule Act, accepted to the fullest possible extent the then benefits of home rule. Powers as to county functions could not have been accepted because the legislature did not then have the power to make such grant. After the consolidation amendment was adopted the legislature had the power and option to make a further grant of home rule power to the city. It has not yet done so. We need not even consider the provisions of the charter, inserted in alleged anticipation of consolidation, since the city cannot expand its own powers without authority from the legislature. Whether, after appropriate legislative action enabling *"county* home rule," the charter will prove to have been adequately drafted to encompass such increased power is not a question for our present consideration.

In reaching our conclusion we have most carefully considered the import of the decision of the Supreme Court in Carrow v. Philadelphia, 371 Pa. 255 (decided June 24, 1952) and have concluded that it is much more narrowly premised than either of the parties hereto suppose. In the formal opinion No. 37 of the city solicitor to the director of finance (annexed to the city's answer as an exhibit in the allied case of Meade et al. v. Clark et al., 87 D. & C. 314, opinion also filed this day) it is stated:

"In the Carrow case, the Supreme Court brushed aside any claim of the necessity of future legislation to make effective the City-County Consolidation Amendment. The court held that the consolidation amendment was self-executing and became effective immediately on its adoption on November 6, 1951."

Plaintiff, on the other hand, is constrained to argue that the Carrow case was improperly decided. We are convinced that neither contention is correct.

We have read carefully the four briefs filed in that litigation and not in any of them do we find a satisfactory consideration of the question of whether the consolidation amendment was self-executing; nor is there any consideration of such question, or the converse question of the necessity for implementing legislation, in the court's opinion or the dissenting opinion. The city's brief contained solely an argument that councilmanic legislation was necessary to make the charter provisions applicable; it made no attempt to analyze the applicability of the Home Rule Act to county legislation and functions. There was a suggestion at the end of the brief that the charter provisions were not framed with an eye to county offices, except in isolated matters; that the charter scheme dealt essentially with city, not county, offices.

We do not think the considerations before us now were entertained by the Supreme Court in the Carrow case and we cannot accept it for the numerous propositions which defendants contend it establishes.

The consequences of an assumption that the Home Rule Act is a county as well as a First Class City Home Rule Act are staggering—not because such a transfer of power may not be desirable but rather because, as our research into the history of the Home Rule Act indicates, such blanket result received no consideration from the legislature. What powers exercised by the legislature are now to be exercised by the city? A consideration of title 16, devoted by Purdon's Annotations to the subject of counties, and the numerous examples in the briefs and pleadings of the parties plaintiff in all six cases before us, will indicate the haphazard scope of such a supposed grant of county home rule. If, as we have indicated, county functions are created

"with a view to the policy of the State at large", can it be concluded that the legislature has already surrendered its legislative powers on such subject? The City-County Consolidation Amendment was a forecast of future legislation but we cannot accept the conclusion or result that it was intended to authorize, in effect, a secession of Philadelphia from the Commonwealth.

The Carrow case ruled decisively that, under the provisions of the Consolidation Amendment and, upon its adoption, the Sheriff of the County of Philadelphia (and by implication all other officers of the county), became an officer of the city and that, accordingly, an employe of the sheriff (and by necessary implication employes of the other county officers) became employes of the city; that the provision in section A-104 of the Home Rule Charter (included therein by the charter commission, in anticipation of the adoption of the consolidation amendment, in order to give former county employes who would become city employes the right to be continued in their positions, if qualified) was held to be valid and applicable and the sheriff was denied the power possessed by former county officers to discharge their employes at will.

From the opinion in the Carrow case, written by Mr. Chief Justice (then Justice) Horace Stern, it further appears that the Supreme Court also concluded that plaintiff in that case, who held her position as an employe of the sheriff at the time of the adoption of the amendment, and all other former county employes at that time, became subject to and covered by the charter's civil service provisions.

The distinguished former justice of the Supreme Court, now appearing as counsel for plaintiffs in the six county cases before us, again raises the question whether the sheriff (who is a plaintiff in one of the cases before us) and the other former county officers

may be legally denied the right which formerly was unquestionably possessed by them, to select and retain their employes notwithstanding the civil service and related provisions of the charter and section A-104. He contends, as we have indicated, that the attempt by defendant city officers to carry into effect the civil service and personnel provisions of the charter with respect to employes in these former county offices is illegal; that the threatened enforcement of certain of the provisions in article X of the charter, especially section 10-104(4), prohibiting political activities by appointed officers and employes of the city would be in violation of the law. Finally he raises the new question that defendants' proposed action requiring the former county officers to obtain legal advice from the city solicitor's office concerning any matter arising in connection with the exercise of their official powers or performance of their official duties and thus compel them to dispense with the services of their solicitors would also be contrary to law.

The Carrow case, unquestionably, has already ruled that former county officers in Philadelphia, since January 7, 1951, lacked the power to dismiss their employes at will and also that their employes are covered by the civil service provisions of the charter. We might readily dispose of several of the questions raised in this case which we believe were already answered by the Supreme Court by merely citing the Carrow case, indicating our lack of power to enjoin defendants from enforcing the provisions of the charter with respect to those matters.

Counsel for plaintiff, however, has argued strenuously that we are not bound by the decision in the Carrow case; that plaintiff's present arguments were not there presented, considered or passed upon. We have already indicated that we think that both sides have misconstrued the Carrow case and we shall endeavor to

show wherein it is applicable and wherein it is not applicable to the case before us. We have already expressed our view that insofar as the city contends that the Carrow case ruled that the consolidation amendment was self-executing, subjecting county offices "to all of the provisions" of the charter, we do not agree. What then did the Carrow case hold? It held that the City-County Consolidation Amendment was self-executing insofar, and only insofar, as it declared that county officers were to become city officers and insofar as, by necessary implication, county employes were to become city employes. Upon the county officers becoming city officers, county employes thereby necessarily became city employes and as the Carrow case develops they came within the scope of the civil service provisions of the charter.

The Supreme Court had before it no other aspect of the question of "self-execution". It is true that the lower court's opinion in that case contains language which may be interpreted as passing on the question of whether the amendment was self-executing as to county functions but the Supreme Court significantly omitted any reference to such question, although urged to do so by the city at the oral argument and in its brief.

In ruling as it did the Supreme Court certainly did not alter the definition of "municipal functions" as used in the Home Rule Act. When the charter, by its terms, purported to apply to former county employes it was not attempting to usurp any function of county government. Since the Consolidation Act of February 2, 1854, P. L. 21, under which the City of Philadelphia (as then laid out) was consolidated with the other 28 separate and independent local governmental units within the area of the County of Philadelphia, both the city and the county became coterminous, and we have had but one common treasury from which was paid the cost of maintenance of both the city and the county

governments administered within the same boundaries. The city's taxpayers, for almost a century, have been required to maintain the dual governments.

The City-County Consolidation Amendment, by the necessary implication of its terms, made every employe in every former county office an employe of the city, although such employe was assigned to perform services relating to former county functions. Even before the City-County Consolidation Amendment was adopted, while such employes were still *county* employes, it was considered a proper exercise of a municipal function for the Council of Philadelphia to fix the salaries of such employes under the authority conferred by the Act of May 2, 1945, P. L. 375, sec. 1, as amended by the Act of May 2, 1947, P. L. 134, sec. 2, 53 PS §3491.1. The legislature's directive in the Act of June 21, 1947, P. L. 849, 53 PS §3493, to the City of Philadelphia to pay increased salaries to all officers elected in the city at large, including the county officers, was legislation relating to the *municipal* affairs of the city.

The Supreme Court having properly determined that the civil service and personnel provisions of the charter are applicable to the sheriff's office and his employes, we turn next to the question of the applicability of the charter prohibition against political activities by such employes. We have indicated that under section 17 of the Home Rule Act there can be no enforcible provisions in the city charter which are not "in relation to its municipal functions"; that provisions in relation to former county functions, though they are to be performed within the area of the city, would be unenforcible. Conversely, however, the city was given, in section 17, full power to legislate as to its *municipal* affairs, "to the full extent that the General Assembly may legislate in reference thereto . . . and with like effect". In view of the determination in the Carrow

case that former county employes are covered by the civil service provisions relating to city employes, importing the clear and necessary implication that such civil service provisions must be regarded as pertaining to municipal functions within the meaning of the Home Rule Act, we are of the opinion that a prohibition against such employes engaging in political activity is also unquestionably a valid exercise of power in relation to municipal functions. Such prohibition cannot be regarded as an interference with county functions still defined and performed pursuant to State legislation. The city has the power, and indeed the duty, to safeguard the city's funds. In the determination of the criteria for securing efficient service, the people of Philadelphia apparently concluded that politics and efficient civil service are negatively correlated.

In Ex Parte Curtis, 106 U. S. 371, 1 Sup. Ct. 381, 27 L. Ed. 232 (1882), an act of Congress prohibiting officers and employes of the Federal Government from giving and receiving any money for political purposes, was held valid. The Supreme Court of the United States stated:

"The evident purpose of congress in all this class of enactments has been to promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service. Clearly such a purpose is within the just scope of legislative power."

In State v. City of Cleveland, 33 N. E. 2d 35 (1940), the Ohio Court of Appeals, in declaring valid and enforcible a provision in a city charter prohibiting political activity by employes in the classified service of the city, stated:

". . . an employe in the classified service is protected from pressure and dictation from his superior officers when candidates or issues are to be voted on by the people and he will be left free to perform his

duties as an employee knowing that his promotion and continuance in office will depend on his efficiency and honesty in public service and not on the influence he will be able to exert at election time at the command of his superior officers in nominating or electing candidates or in carrying or defeating issues."

Having determined that former county employes are city employes within the scope of the civil service provisions of the charter, we are unable to conclude that for any reason the prohibition against political activity is inapplicable. In such circumstance the rule of construction must be one of liberality to effectuate the purposes of the charter. We have already indicated in the case of Meade et al. v. Clark et al., supra, that where the charter is in conflict with a legislative determination of employe criteria, or is not otherwise applicable, we will not judicially impose our concept or any other concept of reform. The reformation of governmental techniques is a legislative, not a judicial issue.

Plaintiff contends in this case that the Home Rule Act spells out a limitation of the grant of power to the city and a reservation of power in the General Assembly similar to that referred to in our opinion in the case of Meade v. Clark, 87 D. & C. 314. In section 18 of the Home Rule Act (53 PS §3421.18) the General Assembly forbade an exercise by the city of power contrary to or in limitation of powers granted by act of assembly which are "(b) *Applicable in every part of the Commonwealth.*" It is unnecessary to determine the applicability of this limitation, if any, to the general functions of the six county offices involved in the cases before us. We have already indicated that insofar as the "county functions" are involved the consolidation amendment was not self-executing; that further implementing legislation is necessary to any purported exercise of city power in such regard. Insofar as the civil service provisions of the charter and

the provisions barring political activity are concerned, the Carrow case has already impliedly held that the employment of personnel for the performance of county functions is, under the consolidation amendment, to be regarded as a municipal function no longer regulated by theretofore so-called "county laws". The difficulties entailed in this self-executing aspect of the consolidation amendment may perhaps be clarified by the following observation: Following the adoption of the City-County Consolidation Amendment there were no longer any county offices, county officers or county employes; they were thereafter city offices, officers and employes subject to appropriate charter provisions; county functions remained unaffected, they are to be performed by the city in the manner and according to the terms declared by the General Assembly, being laws applicable to the county which apply to the city. There is no law "applicable in every part of the Commonwealth" which pertains to the city's employes performing county functions; these employes perform their duties on behalf of the former county officers pursuant to the mandate contained in the first paragraph of the consolidation amendment.

Finally we turn to plaintiff's complaint that defendants are demanding that all county officers obtain their legal advice from the city's law department and dispense with their own counsel. It was to this phase of the cases before us that we directed our general discussion as to whether or not the consolidation amendment was self-executing, deeming such question necessarily involved in the disposition of this aspect of the case. We are of the opinion that the former county officers are entitled to perform the "county functions" enjoined upon them by the legislature without interference by the municipal government; that the city's attempt to foist its law department upon these officers in the performance of such duties is an unwarranted

interference with and usurpation of their county functions without legislative authority.

The city contends that the former county officers having become city officers they are included in the term officer as used in section 8-410 of the charter, which provides as follows:

"Legal Advice and Services. Whenever any officer, department, board or commission shall require legal advice concerning his or its official business or whenever any legal question or dispute arises or litigation is commenced or to be commenced in which any officer, department, board or commission is officially concerned or whenever any taxes or other accounts of whatever kind due the City remain overdue and unpaid for a period of ninety days it shall be the duty of such officer, department, board or commission, to refer the same to the Law Department.

"It shall be the duty of any officer, department, board or commission having requested and received legal advice from the Law Department regarding his or its official duty, to follow the same; and when any officer shall follow the advice given him in writing by the Law Department he shall not be liable in any way for so doing upon his official bond or otherwise.

"Before the Law Department shall render any opinion interpreting any appropriation ordinance or ordinance authorizing the expenditure of money, it shall notify the City Controller of the question upon which its opinion has been requested and afford him an opportunity to present his views upon the question.

"It shall be unlawful for any officer, department, board or commission to engage any attorney to represent him or it in any matter or thing relating to his or its public business without the approval in writing of the City Solicitor."

It is concomitantly contended that in accordance with section 4-400 of the charter the law department is required to furnish such advice.

We do not consider it necessary to enumerate the various State laws set forth by plaintiffs in their pleadings and/or supporting briefs demonstrating the numerous and clearly nonmunicipal functions imposed upon them; it is sufficient to note that we have already observed that it is incredible that the legislature intended, in general, to authorize the city to interfere with these functions. It should be clear that the manner of performance of these functions and duties must to a great extent be determined by the advice received by them from their legal counsel; that the city's demand is an unwarranted interference with such performance.

Other than the three specific respects in which plaintiff claimed that defendant proposed infringing upon his rights, which we have already discussed in this opinion, viz., the attempt to enforce the provisions of the charter as applying to their offices and employes in respect to: (1) Civil service and related matters; (2) prohibition against political activities, and (3) legal services and advices required by them, the pleadings fail to disclose with sufficient particularity any other matters for our consideration. The averments of the complaint as to other alleged proposed illegal acts are vague and general, and, in the prayer for relief, we are asked to enjoin defendant from all such so-called unlawful interference.

As appears from our views expressed in this opinion, the line of demarcation distinguishing purely municipal functions of the city which it may exercise notwithstanding that they may relate, in a measure, to the personnel in the county offices, from functions of county governments, upon which there can be no encroachment by the city, may, indeed, be very fine. Both in his oral argument and in his brief, the city solicitor, appearing for defendants, has stated that the questions involved for our decision relate only to the three

stated categories of alleged interference. The city solicitor's statement as to those three precise issues were unchallenged by the learned counsel for plaintiff at the oral argument. We believe the order hereinafter contained in this opinion adequately affords plaintiffs all relief to which they are entitled. If, however, plaintiffs are still, or later should be, of the opinion that they are entitled to additional relief against other specifically stated alleged unlawful acts of interference by the city officers, under no circumstances should our decision in these cases be construed to preclude their rights.

Wherefore, we make the following

### Final Decree

Now, October 31, 1952, upon consideration of the pleadings, the parties hereto having agreed that a full and final hearing has been held herein, it is hereby ordered, adjudged and decreed that a perpetual injunction issue restraining defendants, their subordinates, agents, and employes, and each of them, from in any manner enforcing or attempting to enforce any of the provisions contained in sections 4-400 (a) and 8-410 of the Philadelphia Home Rule Charter as applying to plaintiff, his office, his subordinates, agents and employes; that plaintiff is entitled to no further injunctive relief in this proceeding at this time, and that, with the above exception, any and all preliminary injunctions and restraining orders heretofore entered by the court are hereby dissolved.

Costs to be divided between the parties.