## EX PARTE CURTIS.

The sixth section of the act of Aug. 15, 1876, c. 287, prohibiting, under penalties therein mentioned, certain officers of the United States from requesting, giving to, or receiving from any other officer money or property or other thing of value for political purposes, is not unconstitutional.

PETITION for a writ of *habeas corpus*.

The sixth section of the act of Aug. 15, 1876, c. 287, entitled " An Act making appropriations for the legislative, executive, and judicial expenses of the government," provides " that all executive officers or employés of the United States not appointed by the President, with the advice and consent of the Senate, are prohibited from requesting, giving to, or receiving from, any other officer or employé of the government, any money or property or other thing of value for political purposes; and any such officer or employé who shall offend against the provisions of this section, shall be at once discharged from the service of the United States; and he shall also be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not exceeding five hundred dollars."

Curtis, the petitioner, an employé of the United States, was indicted in the Circuit Court for the Southern District of New York, and convicted under this act for receiving money for political purposes from other employés of the government. Upon his conviction he was sentenced to pay a fine, and stand committed until payment was made. Under this sentence he was taken into custody by the marshal, and on his application a writ of *habeas corpus* was issued by one of the justices of this court in vacation, returnable here at the present term, to inquire into the validity of his detention. The important question presented on the return to the writ so issued is whether the act under which the conviction was had is constitutional.

The case was argued by *Mr. Edwin B. Smith* in favor of the petition, and by *The Solicitor-General* in opposition thereto.

MR. CHIEF JUSTICE WAITE, after stating the case, delivered the opinion of the court.

The act is not one to prohibit all contributions of money or

property by the designated officers and employés of the United States for political purposes. Neither does it prohibit them altogether from receiving or soliciting money or property for such purposes. It simply forbids their receiving from or giving to each other. Beyond this no restrictions are placed on any of their political privileges.

That the government of the United States is one of delegated powers only, and that its authority is defined and limited by the Constitution, are no longer open questions; but express authority is given Congress by the Constitution to make all laws necessary and proper to carry into effect the powers that are delegated. Art. 1, sect. 8. Within the legitimate scope of this grant Congress is permitted to determine for itself what is necessary and what is proper.

The act now in question is one regulating in some particulars the conduct of certain officers and employés of the United States. It rests on the same principle as that originally passed in 1789 at the first session of the first Congress, which makes it unlawful for certain officers of the Treasury Department to engage in the business of trade or commerce, or to own a sea vessel, or to purchase public lands or other public property, or to be concerned in the purchase or disposal of the public securities of a State, or of the United States (Rev. Stat., sect. 243); and that passed in 1791, which makes it an offence for a clerk in the same department to carry on trade or business in the funds or debts of the States or of the United States, or in any kind of public property (id., sect. 244); and that passed in 1812, which makes it unlawful for a judge appointed under the authority of the United States to exercise the profession of counsel or attorney, or to be engaged in the practice of the law (id., sect. 713); and that passed in 1853, which prohibits every officer of the United States or person holding any place of trust or profit, or discharging any official function under or in connection with any executive department of the government of the United States, or under the Senate or House of Representatives, from acting as an agent or attorney for the prosecution of any claim against the United States (id., sect. 5498); and that passed in 1863, prohibiting members of Congress from practising in the Court of Claims (id., sect. 1058);

and that passed in 1867, punishing, by dismissal from service, an officer or employé of the government who requires or requests any workingman in a navy-yard to contribute or pay any money for political purposes (id., sect. 1546); and that passed in 1868, prohibiting members of Congress from being interested in contracts with the United States (id., sect. 3739); and another, passed in 1870, which provides that no officer, clerk, or employé in the government of the United States shall solicit contributions from other officers, clerks, or employés for a gift to those in a superior official position, and that no officials or clerical superiors shall receive any gift or present as a contribution to them from persons in government employ getting a less salary than themselves, and that no officer or clerk shall make a donation as a gift or present to any official superior (id., sect. 1784). Many others of a kindred character might be referred to, but these are enough to show what has been the practice in the Legislative Department of the government from its organization, and, so far as we know, this is the first time the constitutionality of such legislation has ever been presented for judicial determination.

The evident purpose of Congress in all this class of enactments has been to promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service. Clearly such a purpose is within the just scope of legislative power, and it is not easy to see why the act now under consideration does not come fairly within the legitimate means to such an end. It is true, as is claimed by the counsel for the petitioner, political assessments upon office-holders are not prohibited. The managers of political campaigns, not in the employ of the United States, are just as free now to call on those in office for money to be used for political purposes as ever they were, and those in office can contribute as liberally as they please, provided their payments are not made to any of the prohibited officers or employés. What we are now considering is not whether Congress has gone as far as it may, but whether that which has been done is within the constitutional limits upon its legislative discretion.

A feeling of independence under the law conduces to faithful public service, and nothing tends more to take away this

feeling than a dread of dismissal. If contributions from those in public employment may be solicited by others in official authority, it is easy to see that what begins as a request may end as a demand, and that a failure to meet the demand may be treated by those having the power of removal as a breach of some supposed duty, growing out of the political relations of the parties. Contributions secured under such circumstances will quite as likely be made to avoid the consequences of the personal displeasure of a superior, as to promote the political views of the contributor, — to avoid a discharge from service, not to exercise a political privilege. The law contemplates no restrictions upon either giving or receiving, except so far as may be necessary to protect, in some degree, those in the public service against exactions through fear of personal loss. This purpose of the restriction, and the principle on which it rests, are most distinctly manifested in sect. 1546, *supra*, the re-enactment in the Revised Statutes of sect. 3 of the act of June 30, 1868, c. 172, which subjected an officer or employé of the government to dismissal if he required or requested a workingman in a navy-yard to contribute or pay any money for political purposes, and prohibited the removal or discharge of a workingman for his political opinions; and in sect. 1784, the re-enactment of the act of Feb. 1, 1870, c. 63, " to protect officials in public employ," by providing for the summary discharge of those who make or solicit contributions for presents to superior officers. No one can for a moment doubt that in both these statutes the object was to protect the classes of officials and employés provided for from being compelled to make contributions for such purposes through fear of dismissal if they refused. It is true that dismissal from service is the only penalty imposed, but this penalty is given for doing what is made a wrongful act. If it is constitutional to prohibit the act, the kind or degree of punishment to be inflicted for disregarding the prohibition is clearly within the discretion of Congress, provided it be not cruel or unusual.

If there were no other reasons for legislation of this character than such as relate to the protection of those in the public service against unjust exactions, its constitutionality would, in our opinion, be clear; but there are others, to our minds, equally

good. If persons in public employ may be called on by those in authority to contribute from their personal income to the expenses of political campaigns, and a refusal may lead to putting good men out of the service, liberal payments may be made the ground for keeping poor ones in. So, too, if a part of the compensation received for public services must be contributed for political purposes, it is easy to see that an increase of compensation may be required to provide the means to make the contribution, and that in this way the government itself may be made to furnish indirectly the money to defray the expenses of keeping the political party in power that happens to have for the time being the control of the public patronage. Political parties must almost necessarily exist under a republican form of government; and when public employment depends to any considerable extent on party success, those in office will naturally be desirous of keeping the party to which they belong in power. The statute we are now considering does not interfere with this. The apparent end of Congress will be accomplished if it prevents those in power from requiring help for such purposes as a condition to continued employment.

We deem it unnecessary to pursue the subject further. In our opinion the statute under which the petitioner was convicted is constitutional. The other objections which have been urged to the detention cannot be considered in this form of proceeding. Our inquiries in this class of cases are limited to such objections as relate to the authority of the court to render the judgment by which the prisoner is held. We have no general power to review the judgments of the inferior courts of the United States in criminal cases, by the use of the writ of *habeas corpus* or otherwise. Our jurisdiction is limited to the single question of the power of the court to commit the prisoner for the act of which he has been convicted. *Ex parte Lange*, 18 Wall. 163; *Ex parte Rowland*, 104 U. S. 604.

The commitment in this case was lawful, and the petitioner is, consequently,

    *Remanded to the custody of the marshal for the Southern District of New York.*

Mr. Justice Bradley dissenting.

I cannot concur in the opinion of the court in this case. The law under which the petitioner is imprisoned makes it a penal offence for any executive officer or employé of the United States, not appointed by advice of the Senate [an unimportant distinction, so far as the power to make the law is concerned], to request, give to, or receive from any other officer or employé of the government any money, or property, or other thing of value, for political purposes; thus, in effect, making it a condition of accepting any employment under the government that a man shall not, even voluntarily and of his own free will, contribute in any way through or by the hands of any other employé of the government to the political cause which he desires to aid and promote. I do not believe that Congress has any right to impose such a condition upon any citizen of the United States. The offices of the government do not belong to the Legislative Department to dispose of on any conditions it may choose to impose. The legislature creates most of the offices, it is true, and provides compensation for the discharge of their duties: but that is its duty to do, in order to establish a complete organization of the functions of government. When established, the offices are, or ought to be, open to all. They belong to the United States, and not to Congress; and every citizen having the proper qualifications has the right to accept office, and to be a candidate therefor. This is a fundamental right of which the legislature cannot deprive the citizen, nor clog its exercise with conditions that are repugnant to his other fundamental rights. Such a condition I regard that imposed by the law in question to be. It prevents the citizen from co-operating with other citizens of his own choice in the promotion of his political views. To take an interest in public affairs, and to further and promote those principles which are believed to be vital or important to the general welfare, is every citizen's duty. It is a just complaint that so many good men abstain from taking such an interest. Amongst the necessary and proper means for promoting political views, or any other views, are association and contribution of money for that purpose, both to aid discussion and to disseminate information and sound doctrine. To deny

to a man the privilege of associating and making joint contributions with such other citizens as he may choose, is an unjust restraint of his right to propagate and promote his views on public affairs. The freedom of speech and of the press, and that of assembling together to consult upon and discuss matters of public interest, and to join in petitioning for a redress of grievances, are expressly secured by the Constitution. The spirit of this clause covers and embraces the right of every citizen to engage in such discussions, and to promote the views of himself and his associates freely, without being trammelled by inconvenient restrictions. Such restrictions, in my judgment, are imposed by the law in question. Every person accepting any, the most insignificant, employment under the government must withdraw himself from all societies and associations having for object the promotion of political information or opinions. For if one officer may continue his connection, others may do the same, and thus it can hardly fail to happen that some of them will give and some receive funds mutually contributed for the purposes of the association. Congress might just as well, so far as the power is concerned, impose, as a condition of taking any employment under the government, entire silence on political subjects, and a prohibition of all conversation thereon between government employés. Nay, it might as well prohibit the discussion of religious questions, or the mutual contribution of funds for missionary or other religious purposes. In former times, when the slavery question was agitated, this would have been a very convenient law to repress all discussion of the subject on either side of Mason and Dixon's line. At the present time any efficient connection with an association in favor of a prohibitory liquor law, or of a protective tariff, or of greenback currency, or even for the repression of political assessments, would render any government official obnoxious to the penalties of the law under consideration. For all these questions have become political in their character, and any contributions in aid of the cause would be contributions for political purposes. The whole thing seems to me absurd. Neither men's mouths nor their purses can be constitutionally tied up in that way. The truth is, that public opinion is oftentimes like a pendulum, swinging

backward and forward to extreme lengths. We are not unfrequently in danger of becoming purists, instead of wise reformers, in particular directions; and hastily pass inconsiderate laws which overreach the mark they are aimed at, or conflict with rights and privileges that a sober mind would regard as indisputable. It seems to me that the present law, taken in all its breadth, is one of this kind.

The legislature may, undoubtedly, pass laws excluding from particular offices those who are engaged in pursuits incompatible with the faithful discharge of the duties of such offices. That is quite another thing.

The legislature may make laws ever so stringent to prevent the corrupt use of money in elections, or in political matters generally, or to prevent what are called political assessments on government employés, or any other exercise of undue influence over them by government officials or others. That would be all right. That would clearly be within the province of legislation.

It is urged that the law in question is intended, so far as it goes, to effect this very thing. Probably it is. But the end does not always sanctify the means. What I contend is, that in adopting this particular mode of restraining an acknowledged evil, Congress has overstepped its legitimate powers, and interfered with the substantial rights of the citizen. It is not lawful to do evil that good may come. There are plenty of ways in which wrong may be suppressed without resorting to wrongful measures to do it. No doubt it would often greatly tend to prevent the spread of a contagious and deadly epidemic, if those first taken should be immediately sacrificed to the public good. But such a mode of preventing the evil would hardly be regarded as legitimate in a Christian country.

I have no wish to discuss the subject at length, but simply to express the general grounds on which I think the legislation in question is *ultra vires*. Though as much opposed as any one to the evil sought to be remedied, I do not think the mode adopted is a legitimate or constitutional one, because it interferes too much with the freedom of the citizen in the pursuit of lawful and proper ends. If similar laws have been passed before, that does not make it right. The question is, whether

the present law, with its sweeping provisions, is within the just powers of Congress. As I do not think it is, I dissent from the opinion of the majority of the court.