Edward LECCI, Individually and as Representative of the Nassau County Patrolmen's Benevolent Association, Plaintiff,

v.

William CAHN, District Attorney of Nassau County of the State of New York, Francis B. Looney, Commissioner of Police, Nassau County of the State of New York, Defendants.

No. 70-C-826.

United States District Court,
E. D. New York.

June 14, 1973.

Richard Hartman, Mineola, N. Y., for plaintiff.

Joseph Jaspan, County Atty., Nassau County, Mineola, N. Y., for defendants; by Louis Schultz, Mineola, N. Y., of counsel.

ZAVATT, Senior District Judge.

This is an action brought by Edward Lecci, a police officer, individually and as a representative of the Nassau County Patrolmen's Benevolent Association, against the District Attorney and the Commissioner of Police of Nassau County to declare § 426(3) of the New York Election Law, McKinney's Consol.Laws, c. 17 unconstitutional as being in violation of the First Amendment of the Constitution.[1]   Section 426(3) provides as follows:

"§ 426.   Misdemeanors concerning police commissioners or officers or members of any police force

Any person who, being a police commissioner or an officer or member of any police force in this state:

\*     \*     \*     \*     \*     \*

3.   Contributes any money, directly or indirectly, to, or solicits, collects or

---

1. The plaintiff does not advance a contention based upon the Equal Protection Clause of the Constitution.

receives any money for, any political fund, or joins or becomes a member of any political club, association, society, or committee,

Is guilty of a misdemeanor." [2]

The defendants' amended answer is a general denial of all material allegations of the complaint, except those which identify the plaintiff as a police officer and the defendants as holders of their respective titles and offices. It also pleads lack of standing, lack of case or controversy and res judicata as complete affirmative defenses. The defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56(b). The Attorney General of the State of New York, upon invitation of the court, see New York Executive Law, McKinney's Consol.Laws c. 18, § 71, Financial Services, Inc. v. Ferrandina, 474 F.2d 743 (2d Cir., 1973), has filed a memorandum in support of the defendants' motion for summary judgment.

### Standing; Case or Controversy

Defendants have raised the issues of plaintiff's standing to maintain this action and, since no official action has been taken or threatened against the plaintiff, whether a case or controversy exists. In First Amendment cases, the standing requirement is less stringent in order to avoid a possible "chilling ef-

---

2. A search for the legislative history of this statute has been fruitless. Mr. Fristachi, an Assistant Attorney General of the State of New York, and the New York State Legislative Drafting Commission have advised the court that a similar statute was first enacted in 1881 as part of the New York Penal Code and that the legislative history of that statute and the legislative history, if any, of the present statute have been lost.

The present statute is derived from New York Penal Law of 1909, § 756(3), McKinney's Consol.Laws, c. 40, which, in turn, was derived from the New York Penal Code § 41aa, L.1881 c. 676. There is only one reported New York case dealing with the alleged purpose of a statute limiting the First Amendment rights of members of a police force. McAvoy v. Press Publishing Co., 114 App.Div. 540, 99 N.Y.S. 1041 (1st Dept.1906), involved section 306 of the Revised Greater New York Charter, Laws 1901, c. 466, as amended by Laws 1903, c. 60, which provided:

"No person in the police force shall be permitted to contribute any moneys, directly or indirectly to any political fund or to join or become a member of any political club or association."

The plaintiff, the first deputy commissioner of police of the City of New York, brought five separate actions against the defendant for alleged libelous articles concerning him in his official capacity. The defendant asserted numerous defenses, including the claim that the New York City Charter rendered the plaintiff unfit to take or hold the office of the First Deputy Commissioner of the police force, because he had been and still was a member of the Tammany Hall general committee of the Twenty-Third Assembly District of the City of New York. The court reversed the judgment for the plaintiff and ordered a new trial because of the refusal of the trial court to grant certain of the defendant's requests to charge, including a requested charge that the defendant was entitled to a directed verdict on the basis of the charter provision.

The court interpreted the act and also considered section 41aa of the New York Penal Code of 1899. Apparently, there was no available legislative history of either the City or State statute. Nevertheless, the court regarded the purpose of the Charter provision to be "obvious."

"It was to keep the police out of active, open participation in party politics, and the management thereof, and clearly the deputy commissioner comes within the fair intendment of the statute. . . . If he desired to accept the office, his duty was to resign from his political association. The two offices of district leader and deputy police commissioner were incompatible; obviously so, as a matter of fact, and inhibited by the law. This view is borne out of the provisions of section 41aa of the Penal Code, passed in 1899 . . . [T]his general law, applicable to the whole state, throws light upon the provisions of the charter, and emphasizes the policy of the state to keep the police out of active party management. That the policy so indicated is wise, no one will deny. That it is lawful to make such a requirement as an incident of holding office must be admitted."
99 N.Y.S. at 1044
Shades of *McAuliffe!*

fect" on fundamental rights. Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970); Gray v. City of Toledo, 323 F.Supp. 1281 (N.D. Ohio 1971). In Muller v. Conlisk, *supra,* the court, concerned with a police officer's standing to challenge the constitutionality of his department's disciplinary rule 31, stated:

> "Rule 31 stands as a 'threat of sanctions' intended to inhibit the right of policemen to speak as freely as other citizens on matters of public concern. If, as alleged, it sweeps too broadly, it has the effect of inhibiting constitutionally protected speech. Plaintiff is a member of the group at which Rule 31 is directed and, as such, his right to speak is presently subject to curtailment by Rule 31. This is sufficient to establish his standing to challenge the rule quite apart from any specific sanction which has been imposed upon him for its violation." *Id.* 429 F.2d at 903.

The mere threat that sanctions may be imposed for violating the law in question is sufficient present infringement to justify redress in the courts. *See,* e. g. Zwickler v. Koota, 389 U.S. 241, 88 S. Ct. 391, 19 L.Ed.2d 444 (1967); Dombrowski v. Pfister, *supra;* Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.

3. Two recent Supreme Court decisions have interjected new criteria into the law of standing and case or controversy. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971). These cases hold that federal courts may not issue declaratory judgments on the constitutionality of state statutes when there are pending criminal proceedings in the state courts; taken at their broadest, these cases further require a plaintiff to demonstrate that he has been threatened with prosecution under the statute he wishes to challenge.

Ed.2d 405 (1963); Gray v. City of Toledo, *supra.*[3]

█ A case or controversy does exist as to which the plaintiff has standing to challenge the constitutionality of this section of the New York Election Law.

### The Merits

The defendants contend that this case is governed by Ex Parte Curtis, 106 U. S. 371, 1 S.Ct. 381, 27 L.Ed. 232 (1882) and McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892), as well as their progeny in the Supreme Court, particularly United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (hereinafter Mitchell).

In Ex Parte Curtis, the Supreme Court sustained the conviction of an employee of the United States for having received money for political purposes from other employees of the Government, in violation of a federal statute which antedated the Hatch Act. Under that statute, Chapter 287, 19 St. 143, 1 Supp.Rev.St. 245, political assessments upon officeholders were prohibited, as well as the requesting, giving to or receiving of a contribution for political purposes as between federal officers or employees. The majority opinion invoked the "legislative reasonableness" test, and held the statute constitutional since its "evident purpose . . . to promote efficiency and integrity in the discharge of official duties" was "within the just scope of legislative power." 1 S.Ct. at 384.

The actual impact of these decisions remains to be determined. *See* Note, *Implications of the Younger Cases for the Availability of Federal Equitable Relief When No State Prosecution is Pending,* 72 Col.L.Rev. 874, 889–894 (1972). For the present, the Second Circuit holds: "Absent the overruling of Dombrowski v. Pfister, *supra,* and Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), the situation . . . where no state prosecution is pending against the individual, is one without the reach of *Younger* and brethren." Thoms v. Heffernan, 473 F.2d 478, 483 (2d Cir. 1973).

The dissenting opinion of Mr. Justice Bradley in Ex Parte Curtis, written ten years before Judge Holmes' opinion in *McAuliffe, supra,* seems prophetic in light of the subsequent erosion of the "no right to public employment" principle:

"[This law], in effect, mak[es] it a condition of accepting any employment under the government, that a man shall not, even voluntarily and of his own free will, contribute in any way through or by the hands of any other employe of the government to the political cause which he desires to aid and promote. I do not believe that congress has any right to impose such a condition upon any citizen of the United States. The offices of the government do not belong to the legislative department to dispose of on any conditions it may choose to impose. . . . Every person accepting any, the most insignificant, employment under the government must withdraw himself from all societies and associations having for object the promotion of political information or opinions. . . . Congress might just as well, so far as the power is concerned, impose as a condition of taking any employment under the government, entire silence on political subjects, and a prohibition of all conversation thereon between government employees." 106 U.S. at 376–377, 1 S.Ct. at 386–387.[4]

The view which Mr. Justice Bradley rejected in Ex Parte Curtis was articulated pithily by Judge Oliver Wendell Holmes (then Chief Judge of the Supreme Court of the Commonwealth of Massachusetts) in McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892), decided more than eighty years ago, long before the twentieth-century liberalization of the First Amendment rights of public employees.

In *McAuliffe,* Judge Holmes articulated the "no right to public employment" principle and upheld the Mayor's decision to discharge a policeman for having solicited contributions for a political purpose, an act contrary to police regulations. In an oft-quoted passage, Holmes wrote: "[t]he petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *Id.* at 220, 29 N.E. at 517. That crisp aphorism delimited the free speech rights of government employees for half a century. Ironically, twenty years later, in Hyde v. United States, 225 U.S. 347, 391, 32 S.Ct. 793, 811, 56 L.Ed. 1114 (1912), Mr. Justice Holmes commented: "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." Although the *McAuliffe* principle has not survived as a principle of law, it has done little to advance First Amendment rights, particularly for policemen. It seems to be well-regarded, even today, by a number of police departments which still maintain rigid regulations prohibiting critical speech by policemen against their department, its leaders and its policies. See generally, Note, The Policeman: Must He Be a Second Class Citizen with Regard to his First Amendment Rights? 46 N.Y.U.L.Rev. 536 (1971); Moody, Extending the Shield of the First Amendment to the Outspoken Policeman, 8 Crim.L.Bull. 171 (1972).

In *Mitchell,* the Supreme Court upheld the constitutionality of a portion of the Hatch Act, now codified as 5 U.S.C. § 7324(a) (2), which provides:

"§ 7324. Influencing elections; taking part in political campaigns; prohibitions; exceptions

(a) An employee in an Executive agency or an individual employed by the government of the District of Columbia may not—

\*   \*   \*   \*   \*   \*

(2) take an active part in political management or in political campaigns.

---

4. For further quotations from the dissenting opinion of Mr. Justice Bradley in Ex Parte Curtis, see *infra.*

For the purpose of this subsection, the phrase 'an active part in political management or in political campaigns' means those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President." [5]

In upholding this provision, the Supreme Court employed three criteria: (1) a rational relationship test providing that "For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service." *Id.* 330 U.S. at 101, 67 S.Ct. at 570; (2) the then accepted doctrine that public employment was a privilege and not a right; and (3) the fear that partisan political activity would destroy the efficiency of the civil service. Defend-

ants argue that *Mitchell* has not been overruled and still is the law. *See,* Northern Virginia Regional Park Authority v. United States Civil Service Commission, 437 F.2d 1346 (4th Cir.), cert. denied, 403 U.S. 936, 91 S.Ct. 2254, 29 L.Ed.2d 717 (1971); Broadrick v. Oklahoma State Personnel Board, 338 F.Supp. 711 (W.D.Okla.), prob. juris. noted, 409 U.S. 1058, 93 S.Ct. 550, 34 L. Ed.2d 510 (1972); Fishkin v. United States Civil Service Commission, 309 F. Supp. 40 (N.D.Cal.1969) (three-judge court), appeal dismissed, 396 U.S. 278, 90 S.Ct. 557, 24 L.Ed.2d 463 (1970); Democratic State Central Committee v. Andolsek, 249 F.Supp. 1009 (D.Md. 1966).

■ Despite defendants' contention that *Mitchell* is controlling, I find that it is not binding.[6] The right-privilege distinction upon which *Mitchell* relied, has been abolished in a long line of Supreme Court decisions. *See,* Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29

5. It is to be noted that, whereas this provision of the Hatch Act applies to every employee in the Executive Branch of the Government and to every governmental employee of the District of Columbia, the state statute in controversy singles out and is directed only against members of "any police force in this [New York] state."

In his memorandum in support of the motion of the defendants to dismiss the complaint, the Attorney General contends that this state statute protects:

"a compelling state interest, namely, the interest in promoting government service and advancement based on merit alone, and the interest in safeguarding the public against the exertion of undue political influence by public officials. These interests are particularly compelling with respect to the police department since the department's responsibility for protecting the public makes the merit system of employment especially vital, and because the respect with which the public views the police and the power sometimes available to the police necessitate the encouragement of a politically-neutral police force." (pp. 15–16)

It is to be noted that the New York State Legislature has not enacted similar legislation affecting the Attorney General (the

chief law enforcement officer of the state) and the members of his staff, the several district attorneys throughout the state and the members of their respective staffs, the several county attorneys and the members of their respective staffs or the employees of the several agencies of the villages, towns, counties of the state or of the state itself. Can it be that "promoting government service and advancement on merit alone," "safeguarding the public against the exertion of undue political influence by public officials," "protecting the public" and maintaining the respect of the public are desiderata only as to members of the police forces within the State?

6. Other cases and commentators believe that *Mitchell* has been overruled. *See* Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971) (discussed *infra*) ; National Association of Letter Carriers v. United States Civil Service Commission, 346 F.Supp. 578 (D.D.C.1972) (three-judge court), prob. juris. noted, 409 U.S. 1058, 93 S.Ct. 560, 34 L.Ed.2d 510 (1972) ; Mancuso v. Taft, 341 F.Supp. 574 (D.R.I.1972), aff'd, 476 F.2d 187 (1st Cir., 1973) (discussed *infra*) ; Note, Civil Disabilities and the First Amendment, 78 Yale L.J. 842 (1969) ; Black, The Supreme Court, 1966 Term, 81 Harv.L.Rev. 69, 170 (1967).

L.Ed.2d 534 (1971); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). *See also,* Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968). The reasonable standard test employed in *Mitchell* is no longer applicable to provisions regulating the First Amendment rights of public employees. *See,* Pickering v. Board of Education, *supra;* United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Keyishian v. Board of Regents, *supra;* Elfbrandt v. Russell, *supra;* NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Shelton v. Tucker, *supra;* Sweezy v. State of New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Wieman v. Updegraff, *supra.* *See also,* Note, The First Amendment and Public Employees—An Emerging Constitutional Right to Be A Policeman? 37 Geo.Wash.L.Rev. 409 (1968). Constitutional rights may be limited only where the restrictions are narrowly drawn, specific and directly related to a vital state interest. Keyishian v. Board of Regents, *supra;* Wieman v. Updegraff, *supra.*

The statute before the court involves not only the First Amendment right to free speech, but also the right of freedom of association. The Supreme Court, in United States v. Robel, *supra,* laid down standards which must be satisfied in restricting the right of freedom of association:

"It has become axiomatic that '[p]recision of ,regulation must be the touchstone in an area so closely touching our most precious freedoms.' . . . Such precision is notably lacking in § 5(a)(1)(D) [of the Subversive Activities Control Act]. That statute casts its net across a broad range of associational activities, indiscriminately trapping membership which can be constitutionally punished and membership which cannot be proscribed. It is made irrelevant to the statute's operation that an individual may be a passive or inactive member of a designated organization . . . Thus, § 5(a)(1)(D) contains the fatal defect of overbreadth because it seeks to bar employment both for association which may be proscribed and for association which may not be proscribed consistently with First Amendment rights." 389 U.S. 265–266, 88 S.Ct. 424–425.

Broad restrictions on First Amendment rights cannot stand. Statutes touching upon the freedom of association must be "narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State." Elfbrandt v. Russell, *supra,* 384 U.S. at 18, 86 S.Ct. at 1242 (citing Cantwell v. Connecticut, 310 U.S. 296, 311, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940)).

Applying the principles enunciated in these Supreme Court decisions, a three-judge court, in National Association of Letter Carriers v. United States Civil Service Commission, 346 F.Supp. 578 (D.D.C.1972) (three-judge court), prob. juris. noted, 409 U.S. 1058, 93 S.Ct. 560, 34 L.Ed.2d 510 (1972), declared 5 U.S.C. § 7324(a)(2) [7] unconstitutional "in that its provisions are impermissibly vague and overbroad when measured against the requirements of the First Amendment to the Constitution." *Id.* 346 F.Supp. at 585. As to the defendants' con-

7. Quoted *supra.*

tention that *Mitchell* was binding, the court stated:

"[E]ven if *Mitchell's* holding is considered binding, as the defendants contend, it is inconsistent with subsequent decisions delineating First Amendment freedoms. These precedents, which developed the 'least restrictive alternative test' for governmental incursions into the area of free speech, undercut the 'rational basis' test upon which the *Mitchell* analysis of the Hatch Act was based. The decisions, coupled with changes in the size and complexity of public service, place *Mitchell* among other decisions outmoded by passage of time." *Id.*

■ A review of cases similar to the instant case, involving statutes encroaching on First Amendment rights, lends support to the conclusion that the statute at issue is unconstitutionally vague and overbroad.

In Mancuso v. Taft, 341 F.Supp. 574 (D.R.I.1972), aff'd, 476 F.2d 187 (1st Cir., 1973), a police officer ran for public office without resigning, in violation of two provisions of the charter of the City of Cranston, R. I.: (1) a provision forbidding running for office while a city employee; and (2) a provision, similar to the instant statute, prohibiting directly or indirectly:

"any contribution to the campaign funds of any political organization or candidate for public office or taking any part in the management of any political organization or in the conduct of any political campaign further than in the exercise of the rights of a citizen to express his opinion and to cast his vote."

The court found the first provision unconstitutional and, as to the second provision, said:

"In addition to its other faults, the section does not limit itself to partisan political activity and thus is broader than the provisions approved in *Mitchell*. While it may be permissible to restrict political activities such as using official authority for partisan political purposes, political coercion of subordinates, or non-compliance with the merit system in promotion, the shotgun approach taken here is impermissible." *Id.* at 582.

On appeal, the Court of Appeals affirmed the district court as to the first provision. However, it ruled that plaintiff's challenge to the second provision was "too speculative for federal judicial resolution at this time." It relied exclusively on the Equal Protection Clause of the Fourteenth Amendment, a provision which the district court did not rely on, rather than the First Amendment.

In Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971), the court distinguished between valid purpose and improper manner to achieve the purpose, when it held unconstitutional a city ordinance and charter provision forbidding firemen from taking "an active part in any primary or election" and "prominently identifying themselves in a political race with or against any candidate for office." Pursuant to this legislative prohibition, the City of Macon insisted that individual firemen remove from their automobiles bumper stickers which evidenced support of a particular candidate in the Georgia General Assembly primary election. Reversing the judgment of the district court, which held the challenged ordinance and charter provisions to be both facially constitutional and constitutionally applied, the court found the same to be overbroad:

"[I]t seems patently obvious to us that the Macon charter and ordinance provisions sweep too broadly and proscribe a great deal of political activity which is unrelated to the effective workings of the fire department. It condemns political contributions of money and support by firemen in all campaigns, federal, state, and local. . . . Under the Macon regulatory scheme firemen are effectively rendered political eunuchs. . . . Macon has simply not aimed precisely at particular, specific evils which might justify political regulation." *Id.* at 471.

and concluded that:

> "where the political activities of a public employee are unrelated to the performance of his duties he is to be treated for purposes of adjudicating his First Amendment rights as a 'member of the general public.'" *Id.* at 475.

In Gray v. City of Toledo, 323 F.Supp. 1281 (N.D.Ohio 1971), city police officers brought a class action to declare unconstitutional a state statute, a similar city charter provision and a similar departmental rule forbidding political contributions or solicitations by public employees for any political party and forbidding their participation in politics. The court held the state statute constitutional because the Ohio Supreme Court had interpreted "political party" and "politics" "in its narrower partisan sense." *Id.* at 1286. In holding the state statute constitutional, the court, unlike the court in Mancuso v. Taft, *supra*, held that *Mitchell* was still valid. Nevertheless, it implied, at least, that a prohibition of nonpartisan political activity would be unconstitutional:

> "[T]he position taken by this Court is that the Hatch Act limitations sanctioned by the Supreme Court in *Mitchell* represents the outermost limitation to which any governmental body may restrict the political activities and free speech of its employees. The key concepts are that the promotion, protection and preservation of the efficiency and integrity of the public service constitutes a compelling state interest and that *partisan political* activity by civil servants is a direct and viable threat to an efficient and honest public service." *Id.* (emphasis added).

The court also noted:

> "However, any restriction imposed by the government upon its employees' political activity must be directly related to the goal of prohibiting partisan political activity, the effect of which interferes with the efficiency and integrity of the public service. If

no such relationship exists, the regulation must be struck down as violative of the first amendment rights of the employees." *Id.* at 1285.

Although the court, in *Gray*, upheld the state statute, it held to be unconstitutional the city charter provision which prohibited "soliciting or receiving any assessment, subscription or contribution for any political party or purpose":

> "That portion dealing with 'political purpose' is ambiguous—it encompasses both protected and non-protected activity and is, therefore, overreaching. The phrase 'political purpose', which is presented in the disjunctive, is not limited to conduct regarding partisan officers and issues but relates equally to all candidates and questions, whether or not they are identifiable with a political party. [Citations omitted.] The latter activity is, of course, protected speech. Its bearing upon the efficiency and integrity of the public service is dubious at best and is violative of the plaintiffs' first and fourteenth amendment rights." *Id.* at 1287.

It also held unconstitutional, for vagueness and overbreadth, the departmental rule embodying the words "political" and "politics".

> "In failing to define these terms, Rule 12 is overly broad—it is not drawn with the degree of specificity which is required in order to sustain the restraints which it imposes upon the exercise of constitutional rights.

> Ambiguous words touching upon first amendment rights also suffer the constitutional infirmity of vagueness. The naked use of the words 'political' and 'politics' leaves a police officer in a very precarious position. He must venture a guess as to which activities are encompassed by these words as used in Rule 12. Once he acts, he does so at his peril, always in fear that his superiors in the department will not agree with his particular interpretation of the Rule. Or of equal importance, he could engage in self-

censorship by denying himself the opportunity to engage in protected political activity for fear that such activity would later be deemed activity which is not protected by the first amendment." *Id.* at 1288.

In addition to these federal cases, provisions forbidding public employees from running for public office or contributing to political parties have been struck down by state courts. *See, e. g.* De Stefano v. Wilson, 96 N.J.Super. 592, 233 A.2d 682 (1967); Minielly v. State, 242 Or. 490, 411 P.2d 69 (1966); Fort v. Civil Service Commission of County of Alameda, 61 Cal.2d 331, 38 Cal.Rptr. 625, 392 P.2d 385 (1964); Kinnear v. City and County of San Francisco, 61 Cal.2d 341, 38 Cal.Rptr. 631, 392 P.2d 391 (1964). *See also,* Annotation, 28 A.L.R.3d 717.

The challenged statute does not distinguish between a partisan and a nonpartisan political fund, or a partisan and a nonpartisan political club, association, society or committee. Nor is there an authoritative interpretation of this statute by a New York court limiting it to a partisan political fund, association, society or committee.

For aught that appears a policeman interested in achieving a better environment, improved highways, mass transit or even in the passage of tougher anti-corruption laws, could reasonably fear disciplinary action for violation of § 426(3) of the New York Election Law. One is reminded of the fears of Mr. Justice Bradley in Ex Parte Curtis, *supra:*

"Congress might just as well, so far as the power is concerned, impose as a condition of taking any employment under the government, entire silence on political subjects, and a prohibition of all conversation thereon between government employes. Nay, it might as well prohibit the discussion of religious questions, or the mutual contri-

bution of funds for missionary or other religious purposes. In former times, when the slavery question was agitated, this would have been a very convenient law to repress all discussion of the subject on either side of Mason and Dixon's line. At the present time any efficient connection with an association in favor of a prohibitory liquor law, or of a protective tariff, or of greenback currency, or even for the repression of political assessments, would render any government official obnoxious to the penalties of the law under consideration. For all these questions have become political in their character, and any contributions in aid of the cause would be contributions for political purposes." 106 U.S. 377, 1 S.Ct. at 387–388.

The word "political", undefined as it is, leaves an individual policeman in a quandary as to what is meant. And what is the meaning of the word "joins", as distinguished from "becomes a member of"? Would a policeman be held to violate this statute by his mere presence at a partisan or non-partisan political club of which he is not a member? By this statute, may a policeman run for public office? In today's political realities, affiliation with and support of a political organization is a sine qua non of an effective campaign. If a policeman is prohibited from running for public office, voters are limited in their choice of candidates. See Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Although the restriction of the instant statute applies only to policemen, it is worthy of note that it affects approximately 75,000 policemen in New York State.[8]

The plight of a New York policeman, confronted with the chilling effect of § 426(3) of the New York Election Law is

8. This figure is taken from the letter, dated July 11, 1972, from Al Sgaglione, President of Police Conference of New York, Inc. to William E. Kirwin, Superintendent of New York State Police.

redolent of a ditty in Gilbert and Sullivan's *The Pirates of Penzance*:

"When constabulary duty's to be done
—to be done

Ah, take one consideration with another—with another

A policeman's lot is not a happy one."

■ Even if the decision in *Mitchell* were deemed binding, the instant statute is broader and more vague than that involved in *Mitchell* and would still be invalid. The prohibition on political activ-

ity in the Hatch Act does not extend to nonpartisan political activity. The instant statute proscribes not only partisan political activity, but also nonpartisan political activity.[9] The legislature, in drafting restrictions on policemen's rights, should draft a statute aimed precisely at some particular evil. "[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." Garrity v. State of New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).[10]

9. The breadth of 5 U.S.C. § 7324(a)(2) is limited by 5 U.S.C. § 7326, which provides as follows:

"§ 7326. Nonpartisan political activity permitted
Section 7324(a)(2) of this title does not prohibit political activity in connection with—
(1) an election and the preceding campaign if none of the candidates is to be nominated or elected at that election as representing a party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected; or
(2) a question which is not specifically identified with a National or State political party or political party of a territory or possession of the United States.
For the purpose of this section, questions relating to constitutional amendments, referendums, approval of municipal ordinances, and others of a similar character, are deemed not specifically identified with a National or State political party or political party of a territory or possession of the United States."

10. I do not imply that the instant statute would necessarily be constitutional were it limited to partisan political activity, however well defined. There is a serious question as to whether any statute restricting the partisan political activity of government employees, which is not limited to *on-the-job* activity, or off-the-job actions where the actor invokes his government employment or authority, would be constitutional. A recently proposed bill, apparently drafted in response to *Letter Carriers, supra*, illustrates legislation designed to limit prohibited partisan political activity. H.R. 15978, 92d Cong., 2d Sess. § 2 would amend the Hatch Act, 5 U.S.C. § 7324 (a)(2) to read as follows:

"§ 7324. Use of official authority or influence to affect elections prohibited; other political activities permitted
'(a) An employee in an executive agency or an individual employed by the government of the District of Columbia may not use his official authority or influence for the purpose of interfering with or affecting the result of an election.
'(b) An employee or individual to whom subsection (a) of this section applies retains the right to vote as he chooses, to express his opinion on political subjects and candidates, and. to take an active part in political management or in political campaigns in his role as a private citizen and without involving his official authority or influence.
'(c) For the purpose of this section, the phrase 'an active part in political management or in political campaigns' includes (1) candidacy for or service as delegate, alternate, or proxy in any political convention or service as an officer or employee thereof; (2) participation in the deliberations of any primary meeting, mass convention or caucus, addressing the meeting, making motions, preparing or assisting in preparing resolutions before the meeting, or taking a prominent part therein; (3) preparing for, or organizing or conducting a political meeting or rally, addressing such a meeting or any partisan political matter, or taking any part therein; (4) membership in political clubs and organizing of such a club, except that no person to whom subsection (a) applies shall hold any club office or receive from the club any compensation; (5) distributing campaign literature and distributing or wearing campaign badges and buttons; (6) publishing or having editorial or managerial connection with any newspaper including those generally known as partisan from a political standpoint, and writing for publication

"In a legal system which is based upon the concept of a free and open dialogue for the achievement of political and social changes desired by the people, restrictions upon the ability of a class of persons to partake in that exchange should be tolerated only if justified by an equally strong countervailing interest. . . . Although in the case of policemen the state's interest as an employer may be stronger than with any other civil servant because of overriding [sic] importance of policemen's duties, the unique nature and structure of the police department should not cause a wholesale forfeiture of their first amendment rights. Hopefully, in the future, policemen will be allowed to participate in the free exchange of ideas envisioned by the first amendment to the greatest degree possible and will be restricted only where the interest in effective, efficient and objective police services demands it." Note, The Policeman: Must He be a Second-Class Citizen with Regard to his First Amendment Rights?, 46 N.Y.U.L. Rev. 536, 559 (1971).

The statute at issue is unconstitutionally vague and overbroad, in violation of the First Amendment.

### Res Judicata

■ On September 4, 1970, the defendants moved to dismiss the complaint and for judgment in their favor on the alleged ground that the subject matter of this action had been "completely adjudicated on the same issues in the Supreme Court of the State of New York." The defendants claimed in their supporting memorandum of law that the issues raised in this court were the same as those raised in the state action attacking

a rule of the Nassau County Police Department, which the defendants claimed was similar to § 426(3) of the New York Election Law; that, on July 8, 1970, Justice Wachtler of the Supreme Court, Nassau County, had dismissed the complaint in the state court action holding that the local police department rule was similar in nature and thrust to the Hatch Act as it relates to Federal employees; that the order of dismissal had been affirmed by the New York Appellate Division, Second Department and that leave to appeal to the New York Court of Appeals had been denied; that the plaintiff was attempting by the action brought in this court "to relitigate the same issue . . ." The defendants claimed, further, that the determination of the state court with reference to the local police department rule justified the defendants separate and affirmative defense of res judicata to the complaint in the instant action.

On September 18, 1970, the attorneys for the respective parties entered into a stipulation (which was "So Ordered" by the Court) that this court retain jurisdiction of this lawsuit; that all proceedings herein be stayed pending the commencement by the plaintiff of an action in the Supreme Court of New York State for a declaratory judgment "to consider the constitutionality of Section 426, subdivision 3 of the Election Law of the State of New York, and the completion of said action and said stay of proceedings in this Court shall continue pending the completion of all appeals relating to said New York State Supreme Court action." Since there was no definitive state judicial interpretation of § 426(3) of the New York Election Law, I "So Ordered" the said stipulation in the hope that the New York State courts

or publishing any letter or article, signed or unsigned, soliciting votes in favor of or against any political party, candidate, or faction, except that no such editorial, letter, or article shall make reference to the writer's official employment or authority; (7) organizing or participating in any political parade; (8) initiating or signing nominating petitions on behalf of a partisan candidate, including canvassing for signatures of others; (9) candidacy for nomination or election to any National, State, county, or municipal office."

would interpret this state statute consistent with the Article 1, Section 8 of the New York State Constitution.[11] The stipulation of the parties cannot be construed as a decision by the plaintiff to submit his federal claims for decision by the New York State courts or as an election to forego his right to return to this Court. Nothing that was said by the attorney for the defendants, when both counsel appeared before me and submitted their stipulation for approval, revealed any intention to oppose the plaintiff's return to this Court for a determination of the federal questions raised in the instant action. This stipulation does not bring the instant case within the scope of England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

After said stipulation had been "So Ordered," the plaintiff instituted an action in the Supreme Court, Nassau County, New York, to declare § 426(3) of the New York Election Law unconstitutional. Lecci v. Cahn, No. 11345–70 (Supreme Court, Nassau County, 1970). Justice Velsor, in a brief, unreported decision, granted the defendants' motion to dismiss the complaint. He relied upon Lecci v. Looney, 33 A.D.2d 916, 307 N.Y.S.2d 594 (2d Dept.), leave to appeal denied, 26 N.Y.2d 612, 310 N.Y.S.2d 1025, 258 N.E.2d 729 (1970). This is the earlier case which involved the plaintiff's attack upon Rule 14 of the Rules and Regulations of the Nassau County Police Department. Justice Velsor saw

no difference between that local rule and § 426(3) of the New York Election Law.

"In the opinion of this Court, the reasoning of the Appellate Division in Matter of Lecci v. Looney, 33 A.D.2d 916, 307 N.Y.S.2d 1025, in dealing with rule 14, art. 6 of the Rules and Regulations of the Nassau County Police Department is equally applicable to the statute (Election Law, section 426(3))."

The fact is that the scope of said Rule 14 is much narrower than that of § 426(3) of the New York Election Law.[12] Furthermore, in Lecci v. Looney, the court dealt rather summarily with the substantive constitutional issues raised, relying principally upon *McAuliffe, supra,* and *Mitchell, supra.* I cannot find that Justice Velsor's opinion, which cites Lecci v. Looney, evidences "full litigation," England v. Louisiana State Board of Medical Examiners, *supra,* 375 U.S. at 421, 84 S.Ct. at 468, of the plaintiff's constitutional claims in the New York State courts as to § 426(3). Justice Velsor's opinion in Lecci v. Cahn, *supra* was affirmed without opinion, 37 A.D.2d 779, 325 N.Y.S.2d 400 (2d Dept. 1971), the Court of Appeals denied leave to appeal, 29 N.Y.2d 486, 276 N.E.2d 628, 326 N.Y.S.2d 1025 (1971), and the Supreme Court denied certiorari, 405 U.S. 1073, 92 S.Ct. 1497, 31 L.Ed.2d 807 (1972). Neither the New York Appellate Division nor the New York Court of Appeals wrote an opinion or ruled on plaintiff's federal constitutional issues. "And certainly, it cannot be stated that his con-

---

11. "§ 8. [Freedom of speech and press; criminal prosecutions for libel]

Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

12. "The right of every member of the Force or Department to entertain political or partisan opinions, and to express the same freely when such expression will not concern the immediate discharge of his official duties, and also the right of the

elective franchise, shall be deemed sacred and inviolate; but no member of the Force or Department shall be permitted to be a delegate or representative to, or take active part in any movement for the nomination or election of candidates for political office or public office. Upon the days of election for public offices, held under the laws of the State, he shall, whether specially assigned to attend the polls or otherwise, do all within his power to preserve the peace, protect the integrity of the ballot box, enforce the rights of lawful voters and prevent illegal and fraudulent voting."

stitutional rights were litigated or decided by the [New York Court of Appeals], which refused to hear the petition for appeal." Delozier v. Tyrone Area School Board, 247 F.Supp. 30, 33 (W.D.Pa.1965).

The defendants' motion for summary judgment is denied. I find that section 426(3) of the New York Election Law is unconstitutional for vagueness and overbreadth and hereby grant summary judgment in favor of the plaintiff. *See* 6 Moore's Federal Practice ¶ 56.12.

This is an order.