January 17, 1979

## 79-6    MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CRIMINAL DIVISION

### The President—Interpretation of 18 U.S.C. § 603 as Applicable to Activities in the White House

This responds to your memorandum of November 30 requesting our opinion concerning the application of 18 U.S.C. § 603 to activities in the White House involving the President.[1] Your inquiry arises in connection with a pending investigation of the allegation that during the course of an August 10, 1978 luncheon for about 20 Democratic Party donors and fund-raisers that took place in the Family Dining Room of the White House, the President solicited contributions for a political purpose within the meaning of that criminal statute. This investigation is being conducted in accordance with Title VI of the Ethics in Government Act of 1978, Pub. L. No. 95-521, 92 Stat. 1824. Pursuant to § 601 of that Act, 28 U.S.C. § 592, where an allegation of criminal misconduct is made with regard to persons holding certain high official positions in Government, including the Presidency, the Attorney General is charged with conducting a preliminary investigation of the matter. If he determines that the matter warrants further investigation or if he has not determined within 90 days of receiving the information "that the matter is so unsubstantiated as not to warrant further investigation or prosecution," he is required to apply to a special division of the U.S. Court of Appeals for the District of Columbia for the appointment of a special prosecutor. If the Attorney General concludes that the matter is "unsubstantiated," he must file a memorandum to that effect with the

---

[1] Although your initial inquiry concerned the application of § 603 to both the President and the Vice President, we understand that only its application to the President is now at issue, and have framed our discussion accordingly. In general, however, the analysis here set forth would apply to both the President and the Vice President.

*Editor's Note:* The Special Prosecutor Division of the U.S. Court of Appeals for the District of Columbia Circuit granted leave to the Attorney General to disclose, in the public interest, his report of February 1, 1979, on the above matter. The report is appended to this opinion.

court. In taking the required action, the Attorney General is not to determine whether the allegations constitute a prosecutable offense or whether an indictment should be sought. No constitutional question is therefore raised as to whether a sitting President may be indicted, an issue seen by the Watergate Special Prosecutor in 1974 as an open one.[2]

To assist you in making your recommendations to the Attorney General, you have asked us to address the questions of statutory construction presented by 18 U.S.C. § 603 in this context. Two specific issues are involved: (1) whether a room in the White House reserved for the use of the President is a room "occupied * * * by any person mentioned in section 602 [of title 18]"; and (2) whether a room such as the Family Dining Room is one "occupied in the discharge of official duties." We believe that the answer to the first of these questions is in the affirmative. The answer to the second, a much more difficult issue, depends upon the circumstances of the particular case. We have also summarized the competing views on a third question of statutory interpretation raised by § 603, *i.e.*, whether solicitation of a private person, rather than a Federal officer or employee, was intended to come within the terms of the Act. In light of our resolution of the second issue, we have not, however, reexamined the Department's past position on the third question.[3]

### I. The Statute

Section 603 provides as follows:

Whoever, in any room or building occupied in the discharge of official duties by any person mentioned in section 602 of this title, or in any naval yard, fort, or arsenal, solicits or receives any contribution of money or other thing of value for any political purpose, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

The word "whoever" is broadly inclusive, replacing a reference to "no person" contained in § 603 as originally enacted in 1883.[4] There is no indication that the 1948 enactment of title 18 into positive law, 62 Stat. 683, which changed the word "whoever" (defined by 18 U.S.C. § 591 as interchangeable with the word "person") was intended to limit the sweep of the initial, all-encompassing reference. Judicial construction of the original provision shortly after its enactment established that private citizens, as well as Government officers and employees, fell within the scope of its prohibition. *See, United States* v. *Newton,* 20 D.C. (9 Mackey) 226

---

[2] *See,* Reply Brief for the United States, at 24–34, in *United States* v. *Nixon,* 418 U.S. 683 (1974).

[3] We have not considered a fourth critical question, which turns primarily on matters of fact, *i.e.,* whether a solicitation within the terms of the statute has occurred.

[4] Act of January 16, 1883, cl. 27, 22 Stat. 403, 407, as amended. This Act is commonly referred to as the Pendleton Civil Service Act.

(1891).[5] This construction is in accord with Congress' apparent intent that § 603 apply to all persons.[6]

While the broad prohibition in § 603 is thus to be observed, its application is more narrowly limited to "any room or building occupied" by certain persons for certain purposes. The phrase "any room or building" is relatively straightforward. Since both "room" and "building" are mentioned, it appears that Federal occupation of a single room in otherwise non-Federal premises would not bring the whole of those premises within the area encompassed by the statutory prohibition. On the other hand, the inclusion of a reference to buildings and not simply rooms indicates that common areas such as corridors, and not simply offices in actual use, fall within the scope of the statute.[7] The meaning of the phrases "person mentioned in section 602 of this title"[8] and "occupied in the discharge of official duties" is less clear.

## II. The Persons Mentioned

The bar on solicitation imposed by § 603 applies only in rooms and buildings occupied by persons mentioned in Section 602 of title 18. Section 602 provides:

---

[5] There, the court rejected the defendant's assertion that, to fall within the terms of the statute, the person soliciting had to have been "either an employee of the Government of the United States, or one of the officers named in [the original versions of 18 U.S.C. §§ 602, 606, or 607]." Instead, the court said, Congress could prescribe rules of conduct "to be observed not only by officers and employees of the Government who shall occupy [the specified] places for the time being, but also by the citizen who may for any purpose be allowed to go into these places." 20 D.C. at 231. Relying on the plain language of § 603, the court concluded that the provision should be read as forbidding persons outside the Government from engaging in the forbidden activities in Government buildings. *See also*, *United States* v. *Burleson*, 127 F. Supp. 400, 402 (E.D. Tenn. 1954) ("Section 603 prohibits solicitation or receipt by anybody of contributions in a Government building, or building occupied in whole or in part by Government employees, or persons compensated by money derived from the Treasury of the United States").

[6] *See, e.g.,* 14 CONG. REC. 622 (1882) (Senator Coke) (§ 603 "applicable to all persons"); *id.* at 636 (Senator Hawley) ("forbidding any person in the world").

[7] It should be noted that § 603 was revised in 1948 to prohibit solicitation or receipt of any contribution for any political purpose "from any such person," *i.e.*, from any person mentioned in § 602. The change was intended "to make it clear that the section [would] not embrace State employees in its provisions [albeit that] [s]ome Federal agencies are located in State buildings occupied by State employees." *See* 62 Stat. 722; *see also* H. Rept. 304, 80th Cong., 1st sess. A51 (1947). Earlier draft versions of the criminal code revision did not accomplish such a change and the reasons for its introduction in the later versions are not explained. Compare H. Rept. 152, 79th Cong., 1st sess. A47 (1945), with H. Rept. 152, Pt. 2, 79th Cong., 2d. sess. A46 (1946). In 1951 these additional words were stricken because they had not been contained in the version of § 603 adopted as part of the 1909 criminal code revision. *See* S. Rept. 1020, 82d Cong., 1st sess. (1951), reprinted at 1951 U.S. Code Cong. & Adm. 2578, 2584. This narrowing of the class of potential victims and then return to the statute's original scope does not reveal any intention to alter the dimensions of the zone in which such conduct toward a specified victim class was to be prohibited.

[8] As originally enacted both § 603 and § 606 referred to persons "mentioned in this act" rather than to persons "mentioned in section 602." The current language of reference was adopted as part of the 1948 Criminal Code revision, 62 Stat. 722. This change appears to have no great significance, other than to focus the current inquiry more narrowly on § 602 rather than, in addition, upon other sections of the Pendleton Act.

Whoever, being a Senator or Representative in, or Delegate or Resident Commissioner to, or a candidate for Congress, or individual elected as, Senator, Representative, Delegate, or Resident Commissioner, or an officer or employee of the United States or any department or agency thereof, or a person receiving any salary or compensation for services from money derived from the Treasury of the United States, directly or indirectly solicits, receives, or is in any manner concerned in soliciting or receiving, any assessment, subscription, or contribution for any political purpose whatever, from any other such officer, employee, or person, shall be fined not more than $5,000 or imprisoned not more than three years or both.

The language of § 602 can be construed in a variety of ways. The specific mention of Senators, Representatives, and Delegates without a similar express reference to the President and Vice President might be interpreted to mean that these high-ranking officers were not meant to be included within the scope of the statute.[9] We believe, however, that the inclusion of specific references to legislative officers may more plausibly be explained by congressional intent to override a decision of the Attorney General that Senators and Representatives did not fall within the scope of an earlier provision, enacted in 1876, upon which § 602 was closely modeled.[10] It might also be argued that the language "any person receiving any salary or compensation for services from money derived from the Treasury of the United States * * * " extends on its face to anyone, including the President, who is paid from Treasury funds.[11] This phrase could, on the other hand, be said to serve a distinct purpose in reaching Government

---

[9] The Vice President is often regarded as an officer of the legislative branch by virtue of his responsibilities as President of the Senate. The failure to include a reference to the Vice President along with Senators, Representatives, and Delegates might therefore be said to raise the implication that neither he nor the President in whose stead he may be called to serve were meant to fall within the scope of § 602. The unique nature of the Vice Presidency was relied upon by Acting Attorney General Laurence Silberman in a 1974 opinion that the language "officer or employee of the executive branch" in 18 U.S.C. § 208 did not encompass the Vice President. See letter to Howard N. Cannon, Chairman, Committee on Rules and Administration, U.S. Senate (Sept. 20, 1974). Reliance was also placed on the statutory scheme requiring an officer having a financial interest to disqualify himself, a prospect not reasonably intended to extend to the President and, it may be inferred, to the Vice President; the waiver arrangement included in the statute which assumes the existence of an "official responsible for appointment;" and specific legislative history expressing the view that legislation in the area of conflicts of interest should treat the President and Vice President in a unique fashion. None of these considerations exists in the present case.

[10] 17 Op. Att'y Gen. 419 (1882).

[11] Section 602, as originally enacted, did not list persons receiving salary or compensation derived from the Treasury of the United States among the class of persons forbidden from soliciting or receiving contributions but only among the class of persons who could not be solicited. This arrangement was altered in 1925 as a result of the Federal Corrupt Practices Act of 1925, 43 Stat. 1073. The amendment to § 602 was offered on the floor of the House without any detailed explanation of the drafters' intent. See 65 CONG. REC. 10329 (1924) (Representative Cable).

contractors and other such persons not included within the section's "officer or employee" language, rather than expanding the class of covered "officers" to include the President if it would not otherwise do so. Finally, it might be contended that the word "officers" is used in a narrow constitutional sense to denominate persons appointed by the President or heads of departments whose positions satisfy the traditional requirements of office described in the *Germaine* case,[12] and not elected officers such as the President and Vice President. It has, however, been recognized that the critical consideration in determining the meaning of the word "officer" is not compliance with the *Germaine* standards alone, but rather the intent of Congress.[13] That intent, in this case, is most clearly revealed by the debate on the 1883 Pendleton Act.

Significantly, as was often mentioned in the debate, the problem of "political assessments"—the demand for and collection from Government employees of a percentage of their salary to support the reigning political party and its campaign activities—had been addressed in 1876 by means of an amendment to an appropriation bill, which forbade "all executive officers or employees of the United States not appointed by the President with the advice and consent of the Senate * * * [from] requesting, giving to, or receiving from any other officer or employee of the Government, any money * * * for political purposes."[14] This 1876 provision is, however, not the only relevant precursor to the 1883 legislation. In 1867 a provision which, on pain of dismissal, prohibited any "officer or employee of the Government" from requiring "any workingman in any navy yard to contribute or pay any money for political purposes" was passed as a rider to an appropriation bill.[15] The legislative history of this provision suggests that it was meant to address abuses by such high-ranking officials as the Secretary of the Navy.[16] It therefore seems clear that where Congress intended to limit the sweep of legislation of this sort, it did so expressly, as was the case in 1876. Despite the precedent provided by the 1876 provision, however, most of the proposed bills on the subject of political assessments[17] and § 602 as finally enacted contained no similar express indication that all executive officials were not to be included within its scope. Indeed, on at least one occasion, Senator Pendleton, in an impassioned speech, decried just that sort of technical distinction between

---

[12] *United States* v. *Germaine*, 99 U.S. 508 (1878).

[13] 40 Op. Att'y Gen. 294, 297 (1943); *Steele* v. *United States, No. 2*, 267 U.S. 505, 507 (1925); *United States* v. *Hendee*, 124 U.S. 309 (1888).

[14] Act of August 15, 1876, ch. 287, 19 Stat. 143, 169. As originally enacted, this provision provided that violators would be deemed guilty of a misdemeanor and fined $500; they would also be discharged. This provision is now codified at 5 U.S.C. § 7323; a violation is no longer deemed a misdemeanor and only the penalty of removal has been retained.

[15] Act of March 3, 1867, c. 172, 14 Stat. 489, 492.

[16] *See* CONG. GLOBE, 39th Cong., 2d sess. 1948 (1867) (Senator Wilson).

[17] *But see* 14 CONG. REC. 21 (1882) (Springer proposal to amend 1876 provision to prohibit any Member of Congress, Presidential appointee "or other person" from engaging in the solicitation of Federal employees on pain of criminal fine, but not removal from office).

Presidential appointees and other Federal officers.[18] The congressional intent that those officers formerly excluded from the scope of the provision were henceforth to be included within the class of persons governed by the terms of § 602 and its companion provisions thus seems rather clear.

It does not necessarily follow, however, that the President himself, and not simply Presidential appointees, were similarly intended to be brought within the reach of these new provisions. One brief statement made by Senator Edmunds, reporting a bill developed by the Judiciary Committee in response to a resolution requesting that committee to consider the problem of political assessments, is particularly noteworthy:

> I am instructed by the [Judiciary] Committee * * * to report an original bill which I send to the Chair to be placed upon the Calendar. And I am authorized by the Committee to make this statement that in the draft of the bill it is not the purpose of the Committee to create any implication as to the right of the legislative power to restrain the President in regard to the matters in question. [14 CONG. REC. 600 (1882).]

This oblique statement could signify that Congress did not intend to bring the President within the scope of 18 U.S.C. § 602, § 603, § 606, or § 607, provisions which in large part were modeled upon the Judiciary Committee bill.[19] It is, on the other hand, evident that Congress was particularly sensitive to the important constitutional issue raised by any attempt to limit the President's discretion with regard to the removal of his appointees as would have been the case under § 3 of the bill, the prohibition on removal now found in 18 U.S.C. § 606.[20] Seen in this light, Senator Edmunds' statement has completely contrary implications, suggesting that a committee disclaimer was necessary since the President was indeed regarded as an executive officer of the United States whose politically motivated discharge of a direct subordinate was seen to fall within the scope of the bill.

Support for the latter interpretation and, we believe, critical evidence suggesting that the President falls within the class of persons governed by the bill, is found in a subsequent discussion of § 606, which, in a fashion similar to § 603, refers to "officers or employees of the United States

---

[18] *See* 13 CONG. REC. 5331–5332 (1882).

[19] 14 CONG. REC. 643 (1882) (Senator Maxey).

[20] The power of Congress to limit the President's power of appointment and removal was often debated in connection with the related debate on Senator Pendleton's Civil Service bill. *See, e.g.*, 14 CONG. REC. 608 (1882) (Senator Van Wyck). Continuing disagreement regarding this power may well have caused the Judiciary Committee to request Senator Edmunds to make such a disclaimer.

mentioned in Section 602.''[21] Senator Hawley, who offered the amendment to the Pendleton Civil Service bill which in large part incorporated the Judiciary Committee's proposal for a separate bill addressing the problem of political assessments, described a correction he had made in the language of his proposal as follows:

> [T]his clause, ''by reason of any vote such officer or employé has given or withheld, or may purpose to give or withhold, at any political election,'' has been stricken out. On a moment's thought it was seen that that came in conflict with what is universally admitted to be the right of a Chief Executive to make appointments in a certain branch of controlling offices in accordance with his own political faith. That he has a right to do, and he could not conduct the Government without it * * *. That would have forbidden, as the draft originally stood by an oversight, the President of the United States from changing his attorney-general from one party to another, or changing a foreign minister, or perhaps even changing a cabinet minister. So that part is withdrawn, and it now only forbids employés collecting from each other, and forbids persons going into the Government rooms and offices and there collecting money for political purposes. That is clearly a thing we have a right to do. Then it forbids degrading or discharging a man for giving or not giving money. All three of these things are clearly within our legitimate function. [14 CONG. REC. 622 (1882).]

It is clear, therefore, that he intended the President to be included among the ''officers'' governed by the bill. While narrowing the scope of § 606 to limit its sweeping bar on removal for what in essence would simply be political affiliation as evidenced by an officer's past voting record, Senator Hawley left untouched the prohibition on removal for failure to provide political support in the form of monetary contributions. He thus in large measure eliminated the kind of constitutional concern that may have been the basis for the Judiciary Committee's earlier disclaimer. While a similar question concerning the application of § 606 to the President was subsequently raised by Senator Jones at the close of debate on the political assessments bill,[22] no response was deemed necessary, probably because

---

[21] Section 606 provides:

> Whoever, being one of the officers or employees of the United States mentioned in section 602 of this title, discharges, or promotes, or degrades, or in any manner changes the official rank or compensation of any other officer or employee, or promises or threatens so to do, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

[22] *See* 14 CONG. REC. 670 (1882):

> With respect to the third section of the bill [18 U.S.C. § 606], I should like to ask the Senator from Vermont if the word 'officer' as used here can be held to include the President of the United States? Because if so it would present to my mind a very serious and embarrassing objection to this part of the bill * * *.

(Continued)

the Jones statement failed to take into account the significant degree to which the Hawley correction had narrowed the scope of the § 606 prohibition on removal.

Additional statements in the course of debate evidencing a concern that the President, too, had been involved in political assessment abuses provide further evidence in support of the view that the President was not thought to be outside the intended scope of the 1883 political assessment legislation.[23] So, too, do general statements that the actions of "every officer and employé of the Government who can be thought of" and "any of the officers of the Government of any rank or degree" were to be restricted pursuant to those provisions.[24] These broad statements are particularly noteworthy in a context where Congress could reasonably conclude that all schemes involving any Government official's efforts to coerce a subordinate to contribute funds to a political cause constituted an abuse of power, a violation of the rights of the subordinate, and, a consideration not insignificant in their eyes, a patently inequitable method for diverting funds appropriated for employee salaries into partisan hands. Such policy considerations undoubtedly apply even more strongly to persons closer to the pinnacle of the Government hierarchy where power is most significantly concentrated and the potential for coercion correspondingly great. Particularly where only criminal penalties were provided rather than provision made for discharge or removal of an offending official, policy reasons for prohibiting such abuses of power by the President as much as by any other Government official are clearly present.

A number of arguments based on the language of § 602 and certain statements contained in the legislative history of the Pendleton Act might be cited in support of the view that the President does not come within the class of persons mentioned in that provision. However, the better view, in our judgment, is that the President does, indeed, fall within the terms of that provision.

### III. Discharge of Official Duties

Notwithstanding the application of § 603 to rooms reserved for the use

---

(Continued)

* * * * * * *

    However anxious I may be in common with those around me to reach legitimate civil-service reform, I shall not throw myself in the path of the Constitution to do it. If the officer who controls the executive power of this Government has the right under the Constitution to remove, it would be a most serious question if an issue should be made between the inferior employé and that high official as to the causes of removal * * *.

[23] *See, e.g.,* 13 CONG. REC. 5331 (1882) (Senator Conger); *id.* at 5339 (Senator Hale). *See also, id.* at 4859 (Representative Kasson) (assuming that President was covered by proposed amendment referring to "any Executive officer or employee of the United States").

[24] 14 CONG. REC. 636 (1882) (Senator Hawley). *But see, id.* at 641 (Senator Sherman) (describing a proposed amendment framed in terms of "executive officers" as embracing "every employé of the Government, from postmasters down * * *" but apparently doing so with the intent to show that such persons were within the scope of the amendment, not that others were excluded therefrom).

of the President generally, an issue is nevertheless presented whether rooms in the White House are "occupied in the discharge of official duties."

Significantly, the statute is not framed in terms of property owned or held by the United States; it rather adopts a functional test, focusing on areas used by Federal personnel while they are conducting the Government's business.[25] At the same time, however, no indication is given whether the word "occupied" is intended to refer only to those areas in actual use, to those areas within the zone of normal use, or both.

The legislative history specifically addressing the meaning of this phrase is limited. "Public buildings" were regarded as within the scope of the statute;[26] privately held residences such as lodging houses were not.[27] More insight can, however, be gained by consideration of the overall statutory scheme.

The four companion provisions passed in 1883 constitute a carefully crafted system of overlapping prohibitions designed to eliminate the abusive practice of political assessments. The enactment was intended (1) to eliminate pressures for political contributions relating to Federal employment both on and off the job (by banning solicitation and receipt of contributions and gifts between Federal officers and employees—18 U.S.C. §§ 602 and 607), and (2) to make unlawful all political pressures on the job (by banning solicitation on the job site by any person for any political purpose or intimidation with regard to job tenure, rank or compensation—18 U.S.C. § 603 and 606).[28] In order to accomplish the latter purpose, § 603 went beyond a prohibition of actual physical disruption of the work process,[29] and beyond a less all-encompassing bar on solicitation of Federal employees themselves[30] to prohibit any sort of solicitation or receipt on work premises by or from any person. It sought, in effect, to create for Federal workers a neutral job site free from political solicitation.

This arrangement has dual significance. It is apparent that Congress

---

[25] Congress' action in adopting § 603 was characterized as an exercise of its power to control Government property in a business rather than in a political sense. *See* 14 CONG. REC. 623 (1882) (Senator Coke); *id.* at 669 (Senator Edmunds).

[26] *See, id.* at 625 (Senator Williams); *id.* at 636 (Senator Hawley); *id.* at 640, 670 (Senator Jones).

[27] *See, id.* at 622 (Senator Jones).

[28] Senator Harrison described the proposed scheme as an attempt to "remove from all those in the official service of the United States any other influence or control in their giving than that which may operate upon a private individual." *Id.* at 639.

[29] *See, e.g., United States* v. *Thayer*, 209 U.S. 39, 42 (1908) "It appears to us no more open to doubt that the statute prohibits solicitation by written as well as spoken words * * *. The purpose is wider than that of a notice prohibiting book peddling in a building. It is not, even primarily, to save employés from interruption or annoyance in their business. It is to check a political abuse * * *."

[30] *See* 14 CONG. REC. 638 (1882) (Senator Hawley) ("no human being could, inside of Uncle Sam's buildings or grounds, solicit in any way anybody for a single cent"). *See also* note 7, *supra*, discussing the 1948 and 1951 amendments which altered the scope of § 603 in this regard.

intended § 603 to serve as a mechanism that would remove all possibility of political solicitations being addressed to Federal employees during the course of their employment. It therefore follows that Federal premises should be regarded as "occupied" both where at a particular time an employee is actually engaged in work in a particular area and, more generally, where a group of employees routinely utilize larger areas in the course of their regularly assigned responsibilities.[31] Similarly, in order for the statutory bar to be effective, it seems only reasonable that, along with actual office or work space, common areas such as cafeterias and rest rooms provided on the Federal premises for use during short breaks from the performance of official duties should be seen to fall within the terms of the statute.[32] Finally, it is clear that the mere subjective intent that a particular conversation or transaction conducted on Federal premises be regarded as private cannot have the effect of taking an area in which it occurs outside the zone of "occup[ation] in the discharge of official duties."

At the same time, it is apparent that in developing this statutory scheme, Congress intended to distinguish between Federal employees' public and private lives. A significant portion of the Senate debate on the political assessment portion of the Pendleton Act and related companion legislation was devoted to proposals to extend § 603 and § 606 to cover employee contributions for any political purpose which might be made outside the job site anywhere in the District of Columbia, or in other enclaves within exclusive Federal jurisdiction,[33] and to bar any solicitation sent through the mails to any Federal officer for any political purpose.[34] These proposals,

---

[31] There is at least one suggestion in the legislative history of § 603 that solicitation during a private meeting with a clerk not engaged in official duties at a time when all other clerks normally occupying a public building had left for the day would not fall within the scope of the statute. See 14 CONG. REC. 669 (1882) (Senator Morgan). In citing this example the speaker apparently assumed that the clerk's office was neither actually occupied in the discharge of official duties nor included in an area more generally being utilized by Government employees acting in the course of their employment. Depending on the circumstances, however, reliance on this example may no longer be warranted, for even where an individual employee is not himself engaged in official business, some substantial portion of the premises in which an after-hours meeting might take place may in instances be "occupied in the discharge of official duties" by security guards or maintenance and cleaning personnel. While it might still be contended that an after-hours meeting in a part of a public building not generally patrolled by security guards or occupied by cleaning personnel would not fall within the terms of the statute, at least where the employee who has arranged the meeting is not actually engaged in the performance of official duties, and while other statements in the course of legislative debate and judicial decision may suggest a contrary result, see notes 5 and 30, supra, we need not reach that question here.

[32] Such areas are, for example, regarded as occupied in the discharge of official duties for purposes of the workers' compensation laws. See, e.g., 82 Am. Jur. 2d, Workmen's Compensation §§ 271–272, at 57–59 (1976).

[33] See 14 CONG. REC. 621–630 (1882) (Slater amendment prohibiting solicitation or receipt for any political purpose); id. at 639–642 (Vest amendment similar to Slater amendment); id. at 644 (George amendment broadening § 603 to include "the District of Columbia, or any room or building occupied * * *"); id. at 666–667 (Beck substitute prohibiting any contribution for any political purpose); id. at 667–670 (Morgan amendment prohibiting contribution for political purpose to Senators, Representatives, or Delegates or any person within the exclusive jurisdiction of the United States).

[34] Id. at 650 (George amendment); id. at 670 (Groome amendment).

40

however, were not accepted, and the initial distinction between on-the-job and off-the-job restrictions was carefully preserved. Although the debate on proposed amendments was not specifically couched in First Amendment terms, the Supreme Court in *United States* v. *Thayer, supra,* at 42, observed that "[t]he limits of the Act, presumably, were due to what was considered the reasonable and possibly the constitutional freedom of citizens, whether officeholders or not, when in private life * * *."[35] In keeping with the provision's plain language and this evidence of congressional intent to distinguish between Federal employees' public and private lives, it therefore seems appropriate to interpret the phrase "in the discharge of official duties" as limiting solicitation in premises held or used by Federal personnel, but only to the extent that their presence there is work-related.

Thus, a distinctly different case is presented where certain premises are held by the Federal Government for the purpose of a personal residence rather than as a business office or other similar work site. There is, of course, a connection between the occupancy of such premises and the status of an individual, such as the President, as a Federal officer. If an area is specifically designated to serve at all times purely as a private residence, however, it can hardly be said to be occupied "in the discharge of official duties." Instead, it represents a haven, akin to the private lodging mentioned in the course of congressional debate on § 603, to which that provision was not intended to apply. Such a distinction was recognized in the Criminal Division's 1978 determination that private residences of Foreign Service employees that are either owned or rented by the U.S. Government, and schools, commissaries, recreational facilities, and the like that are operated by employee associations with governmental financial assistance do not fall within the terms of § 603.[36] Areas within the discrete private residence area included in the White House mansion, although not physically detached from areas formally given over to official office space or to areas used for ceremonial functions, may therefore reasonably be seen to fall outside the reach of the statute.[37] Areas routinely used in connection with the discharge of official duties by persons

[35] This statement was made in the course of a discussion in which the Court dismissed defendant's argument that the Senate's rejection of the Groome amendment (which would have prohibited all mail solicitations of Federal employees for political purposes) evidenced an intention not to treat any mail solicitation as within the scope of § 603. *See also, Ex parte Curtis,* 106 U.S. 371 (1882), upholding the 1876 act's narrow limitation on solicitation of Government employees by Government officials while not prohibiting all political contributions.

[36] Letter from Benjamin R. Civiletti, Assistant Attorney General, Criminal Division, to K.E. Malmborg, Assistant Legal Advisor for Administration, Department of State (March 17, 1978).

[37] Although the private residence area may be serviced by Government personnel who provide certain sorts of personal, maintenance, or security services, we do not believe that their presence would convert an area that is otherwise a private residence into one occupied "in the discharge of official duties."

other than the President's family (*e.g.,* the White House mess) would not, however, be similarly excluded.

A more difficult question is posed with regard to political solicitations occurring in rooms which are not located within the purely private residential portion of the White House and which may be used either for personal functions by the President and his family or for official business. As noted above, rooms ancillary to offices or other such work space which are used by employees in connection with their work would ordinarily be regarded as falling within the terms of § 603. In most cases, therefore, it would be appropriate to treat both areas actually being used in the discharge of official duties and those more than occasionally used for such purposes as within the zone of occupation for purposes of § 603. This application of the statute gives effect to Congress' intent that no haven be available on Federal premises from which political solicitations could be addressed to Government workers acting in the discharge of their official duties.

An attempt might similarly be made generally to classify areas within the mansion portion of the White House outside of the strictly private family residence as predominantly used for official or personal purposes. On the one hand, rooms on the first floor of the mansion which are used by the President for official functions, such as the entertainment of foreign dignitaries and Members of Congress, can in a certain sense be said to be occupied by the President in the discharge of his official duties as Head of State and Chief Executive. Participation in ceremonial dinners and attendance at other gatherings in furtherance of the conduct of the President's constitutional duties are ordinarily regarded as essential parts of the President's job. Under this approach, therefore, if White House rooms are normally used for official functions, they would be viewed as "occupied in the discharge of official duties" within the terms of 18 U.S.C. § 603, even though they are used for social functions.

On the other hand, it could be said that the President's role as host, even during official functions, is a private one akin to that of an individual offering hospitality to his friends and business associates in his own home. Where the predominant use of a room is for entertainment by a single person serving in such a capacity, it is by nature personal and should be seen to come within the residence exception previously described. This view might be bolstered by the common sense perception that where a room is utilized for purposes of entertainment of this sort there can be no doubt that it represents a departure from the more traditional work site Congress intended by the enactment of § 603 to protect from politicization. The clear purpose of Congress in protecting Federal employees from political pressure in connection with their jobs would not seem reasonably to extend to controlling conduct or persons attending such gatherings which do not in most cases involve significant numbers of Federal employees and which, although in one sense "official," do not involve what is generally recorded as the transaction of the Government's "business."

Given the quite peculiar nature of the White House and the unique

42

responsibilities of the Presidency, it is our view that a third approach is more appropriate. Necessarily some rooms in the White House may serve in turn as space adjunct to the private residence area and as space adjunct to the areas used for business or ceremonial purposes. Such rooms cannot be properly classified as either "personal" or "official" on any permanent basis. The historical fact is that a single set of rooms has been made available and has been utilized by this and past Presidents, at times in a personal caspacity, and at times for official purposes. Even though such rooms are *sui generis* and cannot reasonably be classified on a permanent basis as fundamentally residential or nonresidential in character, the reasoning described above regarding the application of § 603 would nevertheless apply. We see no reason why the exemption for private residential space discussed previously should not apply to a room that assumes that character only on a part-time or temporary basis when used for a personal or political gathering. In order, however, for Congress' intent that the bar created by § 603 effectively prohibit any sort of political solicitation during the course of Federal employment, more than a subjective intent to use such a room for private purposes is necessary. If it is to be said with any certainty that actions on premises that might either be regarded as occupied for official or for private purposes do not fall within the scope of § 603, evidence of some sort of objective advance determination concerning the nature of their use would in most cases be required. Information regarding past practice with respect to particular rooms, arrangements for reservation and use of such areas, and handling of attendant costs for budgetary and accounting purposes may prove helpful in this regard. Budgetary considerations may be particularly significant, for where the President has determined that a room has been used for official purposes so as to warrant coverage of costs with public funds it would seem that he has implicitly recognized that such a meeting was conducted in the discharge of official duties.

In our judgment, consideration of these criteria as they apply to the facts as we understand them suggests that the August 10 meeting probably falls outside the scope of § 603. We are informed that according to the Federal Bureau of Investigation (FBI) report the Family Dining Room has in the past generally been used for official occasions involving a small number of guests where use of the State Dining Room would be inappropriate. While a separate private family dining room has, since 1961, existed on the second floor of the White House in the President's personal residence, we understand that the Family Dining Room has on occasion been used by President Carter for purely personal purposes: although predominantly used for official functions, it evidently has not been exclusively so. It also appears that the meeting was not expressly scheduled by the Presidential Diarist, a factor that while not providing objective evidence that the meeting in advance was regarded as a private function, at least suggests that it was not regarded as formal official function. Finally, and most significantly, the FBI report indicates that the costs of the

meeting were absorbed by the Democratic National Committee, clear evidence that it was not regarded as an official function. Although further information on past practices would undoubtedly prove helpful in confirming this tentative view, we believe that the private residence exception implicit in § 603's reference to occupation "in the discharge of official duties" would properly be seen to apply in this case.

## IV. Target of Solicitation

A third question not expressly raised in your November memorandum should also be noted in light of the facts here presented: whether an offense is stated under § 603 even if the target of an alleged solicitation is not a Federal officer or employee. Compelling arguments can be marshalled on either side of this issue.

The legislative history discussed above indicates that Congress' purpose in enacting § 603 was to protect Federal officers and employees from on-the-job solicitations. The statute, however, is not on its face limited to Federal officials. The wider sweep of the provision, banning all solicitations on Federal premises, including those involving two private citizens, could be seen as an attempt by Congress to insure the integrity of Government property. It might also be explained as an effort to remove even indirect pressure on Government employees resulting from the presence of solicitors on the premises. Neither rationale figures prominently in the congressional debate, however. It might then be concluded that § 603 should only be applied where its central purpose of protecting Federal employees would be served. Under this interpretation, the solicitation of a private citizen by a Federal officer or employee would not constitute an offense chargeable under the statute.

The opposing view that solicitations of both Federal personnel and private citizens fall within the scope of § 603 finds support in the unqualified statutory language. This sweeping language is in marked contrast to § 603's companion provisions, 18 U.S.C. §§ 602, 606, and 607, which expressly require that the person solicited be a Federal employee. It is therefore reasonable to assume that the choice not similarly to limit § 603 was a deliberate one. Moreover, it is noteworthy that, as previously discussed,[38] § 603 was amended in 1948 to prohibit solicitation "for any political purpose from any such person [*i.e.,* "any person mentioned in section 602" of title 18]," but was changed once again in 1951 to delete the added language. The justification for the initial change was to clarify that political activities involving State employees were not to be encompassed by this provision simply because Federal agencies were located in State buildings. The later change returned the section to its original form in what appeared to be a decision that its scope not be so limited. Congress' determination that repeal of the 1948 amendment was necessary suggests

---

[38] *See* note 7, *supra.*

44

that the 1948 change had either erroneously gone too far in its attempt to clarify existing law by narrowing the class of potential solicitation targets, or that Congress intended to broaden the application of § 603 to include more than those persons mentioned in § 602. In either event, this recent history of congressional amendment can be said to confirm the view that solicitations of private citizens fall within the scope of § 603.

Issue was joined with regard to these competing interpretations of § 603 in 1974 when the view that solicitations of private persons were not included within the scope of this provision was advocated by the Watergate Special Prosecutor's office. The contrary view—that § 603 was applicable regardless of the status of the person solicited—was voiced by the Criminal Division. In early 1975 the Office of Legal Counsel adopted the view of the Criminal Division, and the Office of Legislative Affairs has recently reaffirmed that position in letters to Senators Cannon and Hatfield, dated October 21, 1977 and February 24, 1978, respectively, which summarized the Department's position with regard to the application of § 603 and related statutes. Although this question of statutory interpretation is a close one, we need not reexamine it here in light of our determination in Part III above that, on the facts presented, the Family Dining Room was being used for private purposes rather than in the discharge of official duties within the terms of § 603.

In applying § 603 of title 18 to activities in the White House involving the President, two key questions are posed: (1) whether a room in the White House reserved for the President is a room "occupied * * * by any person mentioned in section 602 [of title 18];" and (2) whether a room such as the Family Dining Room is one "occupied in the discharge of official duties." Based on our examination of the pertinent legislative history, we believe that the President is included within the terms of § 602 and that rooms occupied by the President in the discharge of official duties are therefore encompassed by the prohibition on solicitation found in § 603. A distinct question is raised, however, as to whether rooms in the White House residence area that are predominantly used for purposes of entertainment, including entertainment for official purposes, are similarly included within the scope of § 603. The issue is a difficult one; however, we believe that not only rooms in the private residence portion of the White House but also rooms used for personal entertaining where there is a history of such use and where, as in this case, the cost of such use is not charged against an account appropriating funds for official functions, should not be regarded as an area "occupied in the discharge of official duties" for purposes of § 603.

A third question is also raised under the facts as we understand them: whether solicitation of a private person rather than a Federal officer or employee was intended to fall within the scope of the statute. We have summarized the competing views on this issue, including the Department's past position that solicitations of private persons are offenses within the terms of § 603. We have not, however, had to reexamine this position in

45

light of our view that the events alleged did not occur in a room "occupied in the discharge of official duties."

Finally, we should note a critical threshold issue which we have not here addressed: whether a "solicitation" within the terms of the statute in fact occurred. The limited facts contained in the FBI report suggest that an express request for contributions may not have been made; the problem of what may constitute a solicitation is therefore raised. A particularly narrow construction of this term may be appropriate where First Amendment interests are at stake; however, a further investigation of the facts would be necessary before any definite judgment on this point could be reached.

John Harmon has asked that you be advised that although I am signing this memorandum in his absence, members of our staff and I have discussed this matter with him and the views here expressed are his.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*

# APPENDIX
# UNITED STATES COURT OF APPEALS
# FOR THE
# DISTRICT OF COLUMBIA CIRCUIT
# SPECIAL PROSECUTOR DIVISION

**Filed: February 1, 1979—10:33 p.m.—George A. Fisher, Clerk**

| | |
|---|---|
| **In Re Report of the Attorney General** | : |
| **Pursuant to 28 U.S.C. § 592(b),** | : |
| **No. 79-2** | : |

## MOTION OF THE ATTORNEY GENERAL FOR LEAVE TO DISCLOSE REPORT PURSUANT TO 28 U.S.C. 592(d)(2)

Pursuant to 28 U.S.C. § 592(d)(2), I hereby seek leave from the Division of the Court for permission to disclose the "Report of the Attorney General Pursuant to 28 U.S.C. § 592(b)," No. 79-2 filed in this Court on February 1, 1979. This report concerns a preliminary investigation of an allegation involving the President under the special prosecutor provisions of the Ethics in Government Act of 1978, 28 U.S.C. § 591. Moreover, the circumstances of the White House luncheon on August 10, 1978 have already been the subject of a new article, and continued public comment is foreseeable. In these circumstances, I believe it is in the public interest for the Court to grant leave to me to make public this memorandum as provided in 28 U.S.C. § 592(d)(2).

Respectfully submitted,

GRIFFIN B. BELL
*Attorney General of the United States*

47

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT SPECIAL PROSECUTOR DIVISION

79-2 REPORT OF THE ATTORNEY GENERAL : PURSUANT TO 28 U.S.C. § 592(b) : SUBJECTS: PRESIDENT JIMMY CARTER : VICE PRESIDENT : WALTER MONDALE DEPUTY ASSISTANT TO : THE PRESIDENT FOR : POLITICAL LIAISON : JOEL MCCLEARY :

In accordance with Section 592(b) of Title 28, United States Code, as added by the Ethics in Government Act of 1978, Public Law 95–521, I, Griffin B. Bell, Attorney General of the United States make the following report concerning the receipt by the Department of Justice of information regarding alleged criminal violations by the President; the Vice President; and the Deputy Assistant to the President for Political Liaison, Joel McCleary.

1. *Allegation.* On November 3, 1978, the Federal Bureau of Investigation received an allegation from an informant that on August 10, 1978, the President and Vice President had attended a luncheon in the White House to which were invited approximately 20 prominent business people who had contributed money on past occasions to the Democratic Party. The purpose of the luncheon was allegedly to apprise these former contributors that the Democratic Party had a remaining $1.5 million debt and that their contributions were needed in order to eliminate the debt. According to the source, solicitation or receipt of funds might have occurred at the luncheon in violation of 18 U.S.C. § 603.

The informant said that further information would appear in *New York* magazine during the month of November. On November 13, 1978, a two page article was published in the magazine stating that an unpublicized White House luncheon had been held on August 10, 1978, and that,

although "[t]here doesn't appear to have been any . . . solicitation by any government official at the luncheon session," contributions totaling $100,000 and $25,000 respectively were recorded on reports filed with the Federal Election Commission as having been received by the Democratic National Committee on the day of the luncheon from individuals identified as having attended. A copy of the *New York* magazine article is attached as an appendix hereto.

2. *Statute Involved.* 18 U.S.C. § 603 prohibits the solicitation or receipt of political contributions in any area occupied by any person described in 18 U.S.C. § 602 in the conduct of official duties.[1] 18 U.S.C. § 603 was originally enacted in 1883 as part of the Pendleton Civil Service Act. There are only four known criminal prosecutions under Section 603, and only one in the last seventy years. *United States* v. *Newton,* 20 D.C. (9 Mackey) 226 (1891); *United States* v. *Thayer,* 154 F. 508 (N.D. Tex. 1907), *rev'd,* 209 U.S. 39 (1908); *United States* v. *Smith,* 163 F. 926 (M.D. Ala. 1908); *United States* v. *Burleson,* 127 F. Supp. 400 (E.D. Tenn. 1954).

3. *Investigation.* Because the allegation and magazine article indicated the possibility that 18 U.S.C. § 603 might have been violated, the Department of Justice, pursuant to 28 U.S.C. § 592(a), conducted a preliminary investigation of the matter. Through interviews conducted by the Federal Bureau of Investigation, the following information was developed:

> a) A luncheon was held in the White House on August 10, 1978, attended by 11 business people, 2 union officials, several Democratic National Committee officers and White House staff, Senator Kennedy, President Carter, and, for a brief time, Mrs. Carter.[2]

---

[1] 18 U.S.C. § 603 reads:

Whoever, in any room or building occupied in the discharge of official duties by any person mentioned in section 602 of this title, or in any navy yard, fort, or arsenal, solicits or receives any contribution of money or other thing of value for any political purpose, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

18 U.S.C. § 602, mentioned in Section 603, reads:

Whoever, being a Senator or Representative in, or Delegate or Resident Commissioner to, or a candidate for Congress, or individual elected as, Senator, Representative, Delegate, or Resident Commissioner, or an officer or employee of the United States or any department or agency thereof, or a person receiving any salary or compensation for services from money derived from the Treasury of the United States, directly or indirectly solicits, receives, or is in any manner concerned in soliciting or receiving any assessment, subscription, or contribution for any political purpose whatever, from any other such officer, employee, or person, shall be fined not more than $5,000 or imprisoned not more than three years or both.

[2] According to White House records, the following individuals attended the luncheon: The President; John Amos, American Family Life Insurance Company, Columbus, Georgia; S. Harrison Dogole, Chief Executive Officer, Globe Security Systems, Inc., Philadelphia, Pennsylvania; Armand Hammer, Chairman and Chief Executive Officer, Occidental Petroleum Corporation, Los Angeles, California; Mrs. Armand Hammer; Morris D. Jaffe, Builder and Developer, San Antonio, Texas; Edward M. Kennedy, Senator (Massachusetts); (Continued)

49

b) The luncheon was held in a small room known as the Family Dining Room on the first floor of the Executive Mansion, behind the State Dining Room. The Democratic National Committee reimbursed the White House $414.87 for the cost of the luncheon.

c) The luncheon was arranged by John White, Chairman of the Democratic National Committee, and Evan Dobelle, Treasurer of the Democratic National Committee. According to White, Dobelle, and others, its purpose was to thank the participants for their contributions in eliminating the debt of the Democratic National Committee. White stated that each of the individuals invited had either contributed or pledged to contribute prior to the luncheon. According to Charles Manatt, Finance Chairman of the Democratic National Committee, it was hoped that the luncheon would induce the business people in attendance to continue their support for the Democratic Party.

d) The President met in the Oval Office with Lew Wasserman, Richard O'Neill, and Manatt for a few minutes prior to the luncheon and accompanied them to the Family Dining Room.

e) The President was present for the first hour of the luncheon and made brief remarks thanking those in attendance for their support of the Democratic Party. Joel McCleary, Deputy Assistant to the President for Political Liaison, was apparently present throughout the luncheon.[3] There is no evidence that the President or McCleary solicited or received any money during the luncheon.

f) Eleven of the individuals who attended the luncheon, and Michael Cardozo, Senior Associate Counsel to the President, have been interviewed either in person or telephonically by the

(Continued)
Henry L. Lacayo, Director, National Community Action Projects, UAW, AFL-CIO, Detroit, Michigan; John G. McMillian, Chairman, Chief Executive Officer, President, Northwest Energy Company, Salt Lake City, Utah; Richard J. O'Neill, Santa Ana, California; Jeno F. Palucci, Chairman, Jeno's Incorporated, Duluth, Minnesota; Walter Shorenstein, Chairman of the Board, Milton-Meyer & Company, San Francisco, California; Rosemary Tomich, owner, Siesta Cattle Company, Chino, California; Glenn E. Watts, President, Communication Workers of America, AFL-CIO, Washington, D.C.; Lew A. Wasserman, Chairman of the Board and Chief Executive Officer, Music Corporation of America, Los Angeles, California; Evan S. Dobelle, Treasurer, Democratic National Committee, Washington, D.C.; Mrs. Evan Dobelle, Chief of Protocol, Department of State, Washington, D.C.; Charles T. Manatt, Partner, Manatt, Phelps, Rothenberg, & Tunney, Los Angeles, California, and Finance Chairman, Democratic National Committee; John C. White, Chairman, Democratic National Committee, Washington, D.C.; Mrs. John White; Joel McCleary, Deputy Assistant to the President for Political Liaison, The White House, Washington, D.C.

[3] McCleary is an individual covered under 28 U.S.C. § 591(b)(3), as an "individual working in the Executive Office of the President and compensated at a rate not less than the annual rate of basic pay provided for level IV of the Executive Schedule under Section 5315 of Title 5."

Federal Bureau of Investigation.[4] Each of these people stated that no solicitation of funds occurred at the luncheon. Several witnesses stated that the President confined his remarks to thanking the guests for their past support to the Democratic Party and their efforts in helping to retire the 1968 Robert Kennedy and Hubert Humphrey campaign debts. Senator Kennedy also spoke on the same theme with respect to his brother. No one stated that the President requested or even discussed future contributions. Several participants stated that they heard no discussion whatever of money or future contributions at any time during the luncheon. According to Evan Dobelle, there was one short interchange at the luncheon between White and Dobelle about the size of the remaining Party debt, after which an unidentified person stated that they should get together to see how it could be retired. There is no indication that this interchange involved the President. Several of those interviewed related that after the President left the luncheon, one guest offered to pledge a contribution but was stopped by another participant who told him such matters could not be discussed at the luncheon. According to McCleary, some other people "talked about money" after this incident but he could not recall who.

g) Two of the three persons present at the Oval Office meeting with the President were asked about the discussion and stated that no solicitation or receipt of funds occurred at that meeting. There is no evidence to the contrary. Solicitation or receipt of funds at that meeting was not part of the allegation.

h) Records of the Federal Election Commission indicated that on August 10, 1978, Richard O'Neill donated $25,000 and Lew Wasserman donated $100,000 toward the retirement of the debt of the Democratic National Committee. According to Evan Dobelle, O'Neill's contribution was received during a meeting at Democratic National Committee headquarters and Wasserman's contribution was received at the Madison Hotel. FEC records also disclose that on August 22, 1978, Walter Shorenstein donated $5,000 and on August 24, 1978, John McMillian donated $25,000 toward retirement of the debt of the Democratic National Committee.

i) According to Michael Berman, Counsel to the Vice President, the Vice President was on vacation in Canada from August 7 to August 13, 1978, and was not present at the luncheon.

4. *Analysis and Conclusions.* Section 591(a) of title 28 of the United

---

[4] Those interviewed were Evan Dobelle, Mrs. Evan Dobelle, John White, Joel McCleary, Charles Manatt, Lew Wasserman, Glenn Watts, Rosemary Tomich, John McMillian, Armand Hammer, and Richard O'Neill.

States Code directs the Attorney General to conduct an investigation upon receipt of specific information that any person covered by the Act has committed a violation of federal criminal law. Section 592(c)(1) further directs the Attorney General to apply to this court for the appointment of a special prosecutor if the Attorney General, "upon completion of the preliminary investigation, finds that the matter warrants further investigation or prosecution."

As in all other cases, it is the responsibility of the Attorney General in instances of allegations of criminal conduct against persons covered by the Act, first, to determine the elements of the offense proscribed by the criminal statute at issue and, second, to determine whether the alleged facts would constitute the elements of the offense. Finally, it is my responsibility, as Attorney General, after a preliminary investigation and after an analysis of the evidence of the elements of the offense, to determine whether the case is of sufficient merit to warrant further investigation or whether "the matter is so unsubstantiated that no further investigation or prosecution is warranted." 28 U.S.C. § 592(b)(1).

It is my determination that there is no evidence in this case of conduct by the President, Vice President, or Mr. McCleary which constitutes a violation of 18 U.S.C. § 603. The case is without merit.

The operative facts have been established and no inconsistent evidence was produced by the investigation. The evidence does not support any reasonable inference that the President, the Vice President, or Mr. McCleary was involved in any request for or delivery of campaign contributions at the White House. The Vice President was not in Washington, D.C. on August 10, 1978. There is no evidence that the President or Mr. McCleary, who of all those attending the luncheon are the only ones covered by the special prosecutor provision, made any statement or solicitation or in any other way personally solicited any campaign contributions.[5] This is not surprising since, as Mr. McCleary stated, "the organizers were not looking for money at the luncheon." That the organizers had no such intent is corroborated by the action of one participant when another guest raised the subject of pledging a contribution; he interrupted the other guest and cautioned that they were not to discuss contributions at the luncheon.

The only conduct proscribed in the statute is making a request for political contributions or receiving delivery of such contributions in federal offices. Section 603 is a *malum prohibitum* statute which makes

---

[5] For purposes of this memorandum, I am assuming, without deciding, either that the White House as a whole is a "building occupied in the discharge of official duties by [a] person mentioned in section 602," or that the Family Dining Room is a "room * * * occupied in the discharge of official duties by [a] person mentioned in section 602." Among the several sub-issues that might have to be addressed in order to decide those questions is that of whether the President is a "person mentioned in section 602." I am specifically not deciding that issue at this time.

an activity illegal in certain places although it would be legal if conducted elsewhere. The activity is solicitation or receipt of political contributions.

There is no evidence that any money was received in the White House on August 10, 1978. Likewise, there is no evidence that money was solicited at the luncheon. While money was solicited or received before or after the luncheon at places other than the White House,[6] there is no evidence that any solicitation took place in the White House. Indeed, it appears that the organizers of the luncheon deliberately structured the affair so as to avoid any violation of law. The evidence does support an inference that the luncheon was intended, at least in part, to entertain former contributors with the hope or expectation that they would, in the future, continue their financial support. Such activity, absent a solicitation or receipt on premises covered by the statute, is not prohibited by Section 603.[7]

This reading of the solicitation provision of Section 603 is fully supported by the history of the statute. There is no case law on this point. This statute derives from the 1883 Pendleton Civil Service Act which was designed primarily to eliminate solicitation of campaign funds from federal employees at their work place. The goal was to protect these employees from what were essentially political assessments and to protect the integrity of federal office space. The activity in question here, a social gathering of past and potential contributors who are not federal employees in a White House dining room, falls outside the concern of the statute.

The Department of Justice is unaware of any instance in the ninety-six years since the statute was passed in which a prosecution was undertaken for the type of activity here at issue. The only reported prosecutions to indicate the form of solicitation covered under the statute have involved explicit written requests for money. See United States v. Newton, supra; United States v. Thayer, supra; United States v. Smith, supra.

Moreover, when presented with factual situations involving isolated, non-egregious incidents of actual, explicit solicitations or receipts in federal buildings, the Department has consistently found them without prosecutive merit under Section 603. Thus, even assuming a much broader interpretation of the activity proscribed by Section 603, a prosecution of this matter would be legally unsound, unfair, and without merit.

---

[6] There is no allegation or evidence that the President or Mr. McCleary personally solicited or received a contribution before or after the luncheon on August 10, 1978.

[7] It is entirely legal under Section 603 to solicit outside a protected area. Therefore, to determine whether a Section 603 violation occurred one must look to the behavior actually occurring in the protected area to see if that behavior violated Section 603. Any broader interpretation of Section 603 would make it felonious to invite former contributors to State dinners or other formal functions at the White House or Capitol with the unspoken hope that the former contributors continue their support. The subjective hope or expectation that an individual might contribute money because he or she was invited to a social function at a federal building is clearly outside the coverage of Section 603 unless this hope or expectation is coupled with an actual solicitation or receipt in a protected area. We are not deciding at this time what the meaning of "solicitation" might be in the context of other statutes which are inapplicable here.

To contemplate the possibility of a prosecution on the established facts of this case, one would have to conclude that merely by attending the luncheon or expressing thanks for past contributions, the President or Mr. McCleary should be seen in the eyes of the law as actually having made a solicitation for future contributions and committing a felony. Such a view is untenable.

In sum, there is no factual substantiation of any solicitation or receipt by the President, the Vice President, or Mr. McCleary at the White House on August 10, 1978. There is no evidence of conduct on their part that would fall within the scope and purpose of the statute. Moreover, there is no indication from the preliminary investigation that further investigation could reasonably be expected to disclose evidence of a violation which could warrant prosecution under this statute. The case is without merit.

Therefore, I hereby notify the Court pursuant to 18 U.S.C. § 592(b) that I find the matter is so unsubstantiated that no further investigation or prosecution is warranted, and that no special prosecutor should be appointed.

Respectfully submitted,
GRIFFIN B. BELL
*Attorney General of the United States*
